## LOVEJOY v. MUTUAL BROADCASTING SYSTEM et al.
### No. 4600.

Court of Civil Appeals of Texas. El Paso.
Dec. 15, 1948.

Rehearing Denied Jan. 5, 1949.

W. H. Lovejoy, Dallas, for appellant.

Strasburger, Price, Holland, Kelton & Miller, Philip L. Kelton, Hobert Price, all Dallas, Thomas N. Dowd, Pierson & Ball, Washington, D. C., for appellees.

.PRICE, Chief Justice.

This is an appeal from the judgment of a District Court of Dallas County, 101st Judicial. District. W. H. Lovejoy as plaintiff sued Mutual Broadcasting System, a corporation, and the City of Dallas, for defamation by means of a broadcast made by Cedric Foster through facilities furnished by said defendants. The case was tried to the court and jury, submission was on special issues. On the verdict returned judgment was rendered that plaintiff take nothing. The plaintiff, W. H. Lovejoy, has perfected this appeal therefrom. The parties will be here designated as they were in the trial court.

At the relevant times herein defendants were engaged in the business of broadcasting by radio over a broad section of the United States. The home office of the Mutual was in Cook County, Illinois. It maintained broadcasting facilities in Boston, Mass. Cedric Foster was a radio news commentator of distinction and ability, and during the relevant periods broadcast news as to World War II which was then in progress, and comments on such news. These broadcasts were made from a written script which he prepared. His comments on the German people and officials were rather censorious and severe, reflecting on their character and integrity. Plaintiff was a resident of the city of Dallas. He had served in the armed forces of the United States during the Philippine insurrection, during World War I, and had volunteered in World War II and performed services as an instructor in military science.

 It was, evidently, plaintiff's custom to listen to some of the broadcasts made by Cedric Foster over the facilities of defendant. In regard to those broadcasts he wrote several letters to Foster in which he upbraided Foster in a rather bitter and sarcastic manner for his alleged reflections on the character and valor of the German people. These letters in their general tenor and purport tended also to reflect upon the character and courage of Cedric Foster, and were laudatory of the character and courage of the German folk.

On December 4, 1944, he wrote Foster as follows:

"Cedric Foster: Your broadcast of today shows to what extreme some of our propogandists can go. I have no doubt that some of the Germans have been unreasonable in the manner and to the degree mentioned. We had similar incidents in the last war. Nor were these cruelties confined to the enemy. General Pershing took notice of the fact that some of our boys (and I am glad they were few) killed German prisoners in their care. In this order he cautioned our soldiers along this line and demanded that it cease and that officers would be held responsible for its continuance. He also demanded that all prisoners would be treated with the greatest of kindness and encouraged to write to their people of such kindness. He understood that if the enemy knew of such kindness, more would surrender and thus end the war quicker. All the nations, both friend and foe, know this principle and endeavor to put it into practice, but since there are a few murderers among all races, such isolated incidents will occur in any war.

"It is difficult to believe you are not aware of these things, but had rather give you the benefit of the doubt and assume you mean well. If you do mean well you will broadcast this letter."

The broadcast charged by plaintiff to be libelous was made over the facilities of defendant on December 18, 1944, from the city of Boston, and though it may unduly prolong this opinion, it is thought necessary to reproduce the relevant parts of same:

"3. This broadcast has honestly, and I hope, fearlessly, attempted to point out for the past three years the character of the enemy whom we fight in this war of survival. It is sheer folly to try to cope with any enemy if we do not understand him. And by 'Understand him' one means to acquire a knowledge of his philosophy and his creed and of the tactics he employs in giving life and breath to that creed. In many ways this broadcast has tried to do this. *May* people still refuse to believe. It is understandable why they so refuse. They refuse because the stories of German brutality are such that they cannot conjure up in their minds any persons who claim to cling to even the slightest vestige of a Christian civilization perpetrating the crimes which have been placed at the German door.

"4. This broadcast today is directed to a man who lives in Dallas, Texas, at thirty-two hundred Greenbrier Drive. He has written to me from time to time extolling the high qualities which he declares are to be found in the German people. His latest phillipic, which was written on the 4th of December, I foknd on my desk when I returned from a trip into the southland of North Carolina. In this letter to me he declares: 'You are the bravest man I ever saw behind a microphone. You condemn a great race of people at close range, about three thousand five hundred miles. It takes courage to do this. Of course, many of our innocent boys are a wee bit closer. I was a wee bit closer in the last war. They are learning, and we learned, that the German people were a great race. They fought well and bravely. They treated our prisoners with great consideration and it appears they are doing likewise in this war. The greatest trouble with al*s* wars is that old men like you declare them, and the young men, most of whom never voted, fight and die. You have never heard and you never will hear a veteran who actually faced the Germans at close range, rant as you do over a microphone. They know and respect the Germans as a great people.' That is the end of the quotation of the letter from this gentleman who lives in the State of Texas, in the City of Dallas, at number 3200 Greenbrier Drive. I know that he does not represent the feelings of the great majority of the people in Texas * * * certainly not the Texans whom it has been my privilege to meet on my several trips into the southwestern part of the United States. He does not represent the men from Texas who have been blasting the Germans from one pill-box after another in the fortified town of Dillengen * * * men who are members of the American 90th Infantry Division. Nor does he represent the men from the State of Texas, who waded ashore on the island of New Britain in the face of withering machine gun fire * * * even though those men were

fighting the Japanese and not the Germans. Nor does the gentleman represent the me*m* and women of the State of Texas who volunteered for the armed services of the United States before Pearl Harbor. The State of Texas, has the highest per capita Voluntary enlistment prior to Pearl Harbor in the military forces of this country. Possibly he represents merely the household at 3200 Greenbrier Drive in the city of Dallas * * * or maybe only himself. God forbid that he speak for the State of Texas which has shed its blood so profusely in this wa*s* for freedom. God forbid that he speak for the boys and girls of the Sul Ross School in Waco * * * the men and women of Southwestern University in Georgetown * * * the high school children of Waco and every other high school and university in Texas. God Forbid that he speak for Letty Jo Culley at Baylor University, whose home is in Shawnee, Oklahoma, and who daily follows the course of this war as she prepares to take her place in a future world which she will help to mould. God forbid that he speak for my daughter Shirley, who soon goes to Texas to work on the Dallas Morning News. It was my intention to answer the gentleman from 3200 Greenbrier Drive in Dallas, but Hal Boyle has written the answer * * * he's typed the 'Greatness' of the German people in the red blood of American Soldiers who were slaughtered yesterday * * * mowed down by German fire as they stood completely disarmed, huddled in a field after having been trapped and taken as prisoners of war. Hal Boyle has answered the man on Greenbrier Drive in Dallas as to how considerate the Germans are of those who fall into their hands.

"5. Here is Hal Boyle's story * * * a staff member of the Associated Press attached to the American armies on the western front: .

"6. 'Weeping with rage a handful of doughboy survivors described today how a German tank force ruthlessly poured machine gun fire into a group of about one hundred fifty Americans who had been disarmed and herded into a field in the opening hours of the present German counter-offensive. William B. Summers of Glenville, West Virginia declared: "We had to lie there and listen to the German non-coms kill with pistols every one of our wounded men who groaned or who tried to move." Summers escaped by playing dead. The Americans were members of an artillery observation ba*tallio*n ambushed and trapped at a fork in the road * * * caught by a powerful German armored column of Tiger tanks, whose heavy guns quickly shot up the two dozen American trucks and lightly-armored vehicles. There were no heavy weapons in the American observation column and the entire unit quickly had to surrender. Summers said: "We were just moving up to take over a position at the top of a hill and as we got to the road intersection they opened fire on us. They had at least fifteen to twenty tanks. Then they disarmed us. Then they searched us, They took our wristwatches * * * and anything else they wanted. I guess we were lined up on the road for one full hour. Then they stood us all together in an open field. I thought something was wrong. As we were standing there, one German soldier, moving past in a tank column, less than fifty yards away, pulled out a pistol and emptied it into our men. "A grimy soldier, sitting in the little room here with Summers ran his hands through mud caked hair and broke into sob*t* * * * There were tears in Summers eye*d* as he went on: "Then the Germans opened on us from their armored cars with machine guns. We hadn't tried to run away or anything. We were just standing there with our hands up and they tried to murder us all. And they did murder a lot of us. There was nothing to do but flop onto the ground and play dead." Private William Green of Elizabethtown, Pennsylvania took up the story. He said: "I never saw such slaughter before in this war. They were cutting us down like guinea pigs. Then those German non-commissioned officers began walking around and knocking off our wounded. I kept my head down, but after they had emptied their pistols, I could hear them click fresh cartridges in their hands while they were reloading. Then they went on looking for more of our men to shoot." Charles E. Apman of Verona, Pennsylvania declared: "We just hoped and prayed while we lay there listening to them shoot

every man who moved." The survivors lay in tense, rigid silence in the freezing mud. They lay there for one hour before cautious glances showed that all the Germans had moved away except one Tiger tank. Harold W. Billow of Mt. Joy, Pennsylvania said: "That tank wasn't more than one hundred yards away, but we decided that we had to make a break for it then or never. We jumped up and scattered for the woods. The tank opened up on us, but I don't think that it got many that time." Three hours after the slaughter less then twenty survivors had made their way back to the American lines. Jack Belden of Time Magazine and I rode back to this clearing station with the first survivors picked up by our reconnaissance jeeps.' That is the end of the story transmitted by Hal Boyle. That story is the answer to the man on Greenbrier Drive in Dallas who believes in the 'greatness' of the German people."

A careful perusal of the portion of the broadcast here reproduced and the remainder of same discloses that the author vigorously disagrees with the views expresed by the plaintiff in his letter; vigorously asserts that the views of the author of the letter were not those of the people of the State of Texas; that it would be a calamity if the decent and respectable people of Texas held views such as the plaintiff. To drive home his views to his auditors as to the greatness, valor and virtue of the German people, he reproduces the story of Hal Boyle, a staff member of the Associated Press attached to the American Armies on the Western front. In substance the broadcast does not attribute any opinions to plaintiff other than those reflected in his letter of December 4th. It is susceptible of construction that those views were unsound and contemptible. The evidence fails to disclose that any of the facts stated in the broadcast are untrue. It is realized that where language is libelous per se that the burden does not rest upon the plaintiff to show the falsity thereof. However, at the relevant time we may say that judicial notice may be taken of the fact that aside from Germany, Japan and Italy, the views of plaintiff in regard to the German people resident in the Empire of Germany

and prosecuting a war against the Allies, were not those of the civilized world. The broadcast attributes to plaintiff no views aside from those expressed in the quoted letter. But the quoted letter is not the only letter plaintiff wrote to Cedric Foster prior to the broadcast complained of. We here quote a portion of letter dated April 6, 1943, written by plaintiff to Foster. In part he says: "We entered this war because of a small vocal minority, because these (otherwise good Americans) had rather Britain and not Germany should dominate Europe and Britain and Holland should dominate the southern Pacific rather than Japan."

Further he says: "England created her empire when getting was good, and by sheer force, just as Germany and Japan are doing today. The moral issues are identical. We also wrested this country from a weak people and our skirts are no cleaner."

Again in this letter he says: "We are merely fighting to perpetuate a condition that has caused more suffering than all other causes combined and anyone who thinks we will establish freedom and equality for all people regardless of the outcome of this struggle, (That is if we win) has no conception of history. It makes no difference how much we sacrifice and how many youths we bury on all sides of the earth, the whole thing will be in vain. It is truly pathetic."

This letter, regardless of truth or falsity, tended to justify and palliate the actions of the enemies of his country. If the views expressed in this letter became the views of those fighting in the Allied Army it would have a graver effect in destroying morale than anything put forth by the German minister of propaganda, Dr. Goebbels.

This case was submitted to a jury on special issues, and to those issues plaintiff made no objection. The jury found in substance as follows: That the statements made by Foster in the broadcast complained of did not lead those listening thereto to believe that the plaintiff did not possess any of the many virtues ascribed to the people of Texas therein; that the statements made by Foster over the radio did not lead those listening to believe that the plaintiff, Lovejoy, was a Nazi and Hitler sympathizer;

that the statements made were true; that those listening to Foster's broadcast were led to believe that the plaintiff believed the Nazi criminals were great and considerate Germans; that plaintiff knew, or by the exercise of ordinary care could have known of the custom of Foster to use letters received from listeners on his broadcast and to comment thereon; that plaintiff impliedly invited Foster to use his letter of December 4, 1944 and to comment thereon; that plaintiff had suffered no actual damage.

■ Appellant's first point of error is: "The court erred in not instructing the jury that the broadcast complained of was libelous per se, and that damages were presumed."

The plaintiff made not a single exception to the court's charge, and in the absence of exception he cannot now complain on appeal.

■ The second point of error: "The court erred in not submitting an issue of the right of privacy."

If the issue of violation of the right of privacy was raised it was the duty of plaintiff to request in proper form this issue, otherwise same was waived. In plaintiff's statement under the point of error it is not shown that plaintiff requested such a charge in proper form. Absent such request, he cannot complain on appeal. The evidence, we think, warrants a finding that plaintiff expected Foster to broadcast his letter.

■ Point 3: "The court erred in not instructing the jury that a publication may be literally true, yet if the sense and substance of the whole publication conveys a false impression because of insinuation or suggestion, such publication is untrue."

Again here an error of omission rather than commission is urged. There is no showing in the brief that any such request was made to the court. This assignment fails to present error.

■■ No. 4 is as follows: "Findings of special issues 1 and 13 were contrary to the evidence and with a total disregard of the insinuations and imputations alleged in paragraph 8 of the appellant's petition, and shown in paragraph 4 and 7 of the manu-

script from which Cedric Foster read the broadcast complained of."

Neither special issue 1 or 13 was excepted to. However, this does not preclude plaintiff from attacking same if against the preponderence of the evidence. Nowhere in the broadcast are the virtues of plaintiff discussed. The views as expressed by the plaintiff in his letter of December 4 are set forth fairly and truly. They are, in substance, his own words. If plaintiff was subjected to hate and ridicule it was not on account of any false statement published by the defendant in the broadcast, it was on account of the views set forth in the letter of December 4, 1944. In answer to special issue 13 the jury found in substance that the broadcast did not lead those listening thereto to believe that the plaintiff, W. H. Lovejoy, believed the Nazi criminals were great and considerate Germans. We do not believe that the broadcast was susceptible of such construction. The head and fount of the offending broadcast was that they fairly disclosed the views of the plaintiff as same were expressed in writing. It is true that by fair implication his views are criticized, but criticized as the views expressed in his own letter.

■ Point of error No. 5 is: "Findings in special issue No. 8 was not supported by any evidence produced by the defendants, nor was there any testimony offered to prove, or that tended to prove the truth of the broadcast complained of."

No. 8, taken in connection with the preceding question, found in substance that the broadcast of December 18, 1944, led those listening thereto to believe that plaintiff W. H. Lovejoy was a Nazi and Hitler sympathizer, however, that the statements made by Cedric Foster were true. The point of error is not supported by any statement. Beyond any question plaintiff wrote the letter of December 4, the substance of which is quoted in the broadcast. Beyond any question a government controlled by the Nazi party, headed by Adolf Hitler, was waging war against the United States and the Allied countries. The Nazi government was using the German people to wage this war. He asserts: "The German

people are a great race; they fought well and bravely, they treated our prisoners with great consideration and it appears they are doing likewise in this war."

In our opinion the letter intrinsically, when taken in consideration with all of the surrounding facts and circumstances, with prior assaults upon Foster, the known facts of history justifies the finding the jury made to special issue No. 8.

If the broadcast of December 18, 1944, tended to injure plaintiff's reputation it was on account of the publication of his letter of December 4. The letter disclosed that he held the German people in high esteem; in substance he so stated. In response to special issue No. 10 the jury found that the plaintiff knew of the custom of Foster to use and comment upon the letters received from his listeners. If there be justification in the evidence for the finding, and plaintiff failed to point out that such evidence was lacking, plaintiff impliedly invited the publication of his letters. Publication assented to or invited will not support an action for defamation. 33 Am.Jur. p. 105, par. 93.

Complaint is made as to the reception of certain letters in evidence. The statement under the point of error fails to show what objections, if any, were made. No error is shown; plaintiff not being entitled to recover the charge as to measure of damages is immaterial. Various complaints are made as to the failure of the court to give certain charges, but no showing is made that request in proper form was made therefor. Request for certain instructions were made en masse. Manifestly many of the requests are improper.

Complaint is made that the evidence is insufficient to sustain the answer made to Special Issue No. 8. Just what is the proper interpretation of the finding as to special issue No. 8 is somewhat ambiguous. One construction is that from the statements made by Foster that his listeners were led to believe that plaintiff was a Nazi and Hitler sympathizer were true. Another possible construction is that it was true that plaintiff was a Nazi and Hitler sympathizer. Serious and grave as this implication was, if true it was no libel. Caller Times Pub. Co. v. Chandler, 134 Tex. 1, 130 S.W.2d 853.

If this latter construction be adopted, if untrue it was libelous per se. See Goodrich v. Reporter Pub. Co., Tex.Civ.App., 199 S.W.2d 228, Wr.Ref. The portion of the letter of April 6, 1943, copied heretofore, was some evidence of the sympathetic leaning toward the National Socialistic party then governing Germany. His letter of December 4, 1944, is susceptible of the interpretation that there was some sympathy for the German people through whom the Nazi party was functioning and that they were a great, good and valiant people. It is true that in order for the truth to be a justification ordinarily it must meet the precise charge. (No charge is here made that plaintiff believed the Germans were a great people was such). However, substantial truth is all that is required. 53 C.J.S., Libel and Slander, § 137 b; p. 224; Enterprise Co. v. Wheat, Tex.Civ.App., 290 S.W. 212; Lundberg v. Brownsville Herald Pub. Co., Tex.Civ.App., 66 S.W.2d 375.

In our opinion plaintiff invited the publication of his letter. The account of the horrible atrocities committed by members of a race which plaintiff deemed a great race, against our soldiers is no reflection on plaintiff.

It is ordered that the judgment of the trial court be in all things affirmed.