**CITY TRANSP. CO. OF DALLAS v. DAVIS et al.**

**No. 3003.**

Court of Civil Appeals of Texas. Eastland.

April 17, 1953.

Rehearing Denied May 8, 1953.

Turner, Atwood, White, McLane & Francis, Dallas, for appellant.

McKool, McDaniel & Bader, Dallas, Bowyer, Gray, Thomas & Crozier, Dallas, for appellees.

GRISSOM, Chief Justice.

On January 1, 1951, Arthur Davis, a Negro boy seven years of age, was hit and

injured by a taxicab owned by City Transportation Company of Dallas. Arthur and his mother recovered a judgment for $5,000 and $2,000 respectively, and said company has appealed.

The jury found, among other things, that the taxi driver (1) failed to keep a proper lookout, which was (2) a proximate cause of Arthur's injuries; (5) failed to have the cab under control, (6) which was negligence and (7) a proximate cause of Arthur's injury; (8) failed to stop his vehicle immediately prior to striking Arthur and that this was (9) negligence and (10) a proximate cause of Arthur's injuries and that the taxi driver (11) failed to apply his brakes "in time just prior to striking" Arthur and that this was (12) negligence and (13) a proximate cause of Arthur's injuries.

The jury also found that (17) the taxi was being driven twenty-five miles per hour but that (18) this was not negligence. It found (20) that Arthur did not run from behind another automobile into the path of the taxicab; (23) that Arthur did not attempt to cross Hall Street at a place which was not an intersection; (26) that Arthur did not fail to keep a proper lookout for the taxicab and (29) that the collision was not the result of an unavoidable accident.

Appellant's first to fourth points, inclusive, are that the evidence was insufficient to sustain the answers to issues one, two, five, six, seven, nine, ten, twelve and thirteen; that there was no evidence to support the answers to and the submission of said issues, and that the answers thereto are against the great preponderance of the evidence.

Briefly stated, appellees' evidence was to the effect that Jewett Street runs east and west, with the east end running into and terminating on Hall Street; that Hall Street runs north and south; that about the middle of the day, after a rain but while it was still drizzling, Arthur walked down Jewett Street and stopped where it entered Hall Street, looked in both directions and, saw appellant's taxicab coming toward him, going south, more than a block away; that he started walking east across Hall Street and about the time he was in the center of the street, or about one step east of the

center, appellant's taxicab struck him, knocking him into the air and then striking him again, leaving him unconscious in the gutter on the east side of Hall Street; that the taxi driver did not apply his brake, did not slow his cab nor turn to the right or left before striking the boy; that, although it was misting rain, a person was easily visible for more than two blocks; that there were no skid marks on the pavement and the taxi driver did not apply his brakes before he hit the boy.

The taxi driver testified that he did not see the boy until he appeared in the street only five or six feet in front of him; that the boy was running west across Hall Street with his sweater over his head and darted out from behind an automobile, which was going north, directly into the path of the taxicab. It is appellees' contention, sustained by ample evidence, that the boy was walking east, not west, across Hall Street; that he did not have a sweater over his head and he did not dart out from behind another car into the path of the taxicab; that the driver of the taxi did not blow his horn, did not turn to the right or left, did not apply his brakes or slow his cab before striking the boy, although he could have been seen by the taxi driver when he was more than a block away.

■ After careful study of the statement of facts, we conclude there was sufficient evidence to sustain the jury's finding that the taxi driver (1) failed to keep a proper lookout, which was (2) a proximate cause of Arthur's injuries; (5) that he failed to have the cab under control and (6) that this was negligence and (7) a proximate cause of Arthur's injuries. It is undisputed that the taxi driver (8) failed to stop the car immediately prior to striking Arthur, which was found as a fact by the jury. We further conclude that the evidence is sufficient to sustain the finding that failure to stop was (9) negligence and (10) a proximate cause of Arthur's injuries. The evidence sustains the finding that the driver (11) failed to apply his brakes in time just prior to striking Arthur and (12) that this was negligence and (13) a proximate cause of Arthur's injuries. The evidence is such that the jury could have reasonably be-

lieved that Arthur was properly crossing Hall Street, going east; that he could have been seen by the taxi driver, if he had been keeping a proper lookout, from the time Arthur stepped off the curb and entered Hall Street, when the taxi was more than a block away, until the cab struck the boy and that, if the taxi driver had been keeping a proper lookout, he could have seen Arthur in time; that, by a prompt application of his brakes or turning, he could have stopped the cab or have avoided striking the boy. Appellant insists there is no evidence of where the taxicab was when Arthur entered Hall Street. Arthur testified that it was then about a block and a half away. Points one to four, inclusive, are overruled. See Rinn v. Holstrom, Tex. Civ.App., 243 S.W.2d 862; Sigmond Rothchild Co. v. Moore, Tex.Com.App., 37 S.W. 2d 121; 5 Tex.Jur. 705; 2 Tex.Jur. 10 Yr. Supp., page 169; Kimbriel Produce Co., Inc., v. Webster, Tex.Civ.App., 185 S.W.2d 198, 200 (RWM); Blunt v. H. C. Berning, Tex.Civ.App., 211 S.W.2d 773 (Writ Ref.).

Appellant's fifth point is that the court erred in permitting appellees to corroborate Viola Harris and Lela Baker by referring to and reading previous consistent testimony of said witnesses. The judgment appealed from was rendered on the third trial. The case had been previously tried in June and November, 1951. Appellant's complaint, with reference to Viola Harris, is that appellees asked her the following question: "Now, Viola, in regard to these facts that you have told the jury here, have you related those facts before since this accident happened from January until the present time" and that, over appellant's objection, said witness was permitted to answer that she had "related these matters before * * * along about June 6" and after June 6th. The record reveals the following proceedings with reference to the introduction of such evidence:

"Q. Now, Viola, in regard to these facts that you have told the Jury here, have you related those facts before since this accident happened from January until the present time?

"Mr. Hartnett: We object to that, Your Honor.

"The Court: Read that question. (The last question propounded is read by the Reporter.)

"Mr. Hartnett: We object to it. It has nothing to do with the Plaintiff's law suit, what she has related before.

"The Court: Sustain the objection.

"Mr. McKool: What was the Court's ruling?

"The Court: Objection sustained.

"Mr. Crozier: It is irrelevant, I guess.

"Mr. McKool: Your Honor, we want to introduce it for the purpose of showing the memory of the party in regard to the facts.

"Mr. Hartnett: That is for the Jury to decide; that is in the province of the Jury. If he wants to impeach her that is a different matter, otherwise it is immaterial and irrelevant to any issue in this case.

"The Court: What do you say to that comment there? Do you think that justified the admission of it?

"Mr. McKool: Judge, it has been 17 or 18 months since this happened.

"The Court: If you think you are entitled to have it I will reverse the ruling. Objection overruled.

"Mr. Hartnett: Note our exception. I know he has repeated some things since then, and we object to the question because that question is wholly immaterial and irrelevant to any issue in this case, it invades the province of the Jury; the Jury has the witness before them, and the Jury is the sole judge of the credibility of the witness and the demeanor of the witness and as to whether or not the witness possesses a good memory, and the question merely tries to lift the Plaintiff up by their own boot straps and attempts to bolster the testimony of the witness.

"The Court: Proceed.

"Q. (By Mr. McKool) Will you answer the question, please Viola? Will you read it to her, Mr. Reporter? (The previous question is read by the reporter.)

"The Court: The question is, have you related these matters before?

"Q. Since January 1, 1951? A. Yes, sir.

"Q. Could you tell us about when you did relate them?

"Mr. Hartnett: We object to that for the same reason.

"The Court: Give the date if there is a date. Overrule the objection. Just give the date.

"A. It was along about June 6.

"Q. (By Mr. McKool) Of what year? A. 1951.

"Q. Is that the only time? A. No, sir, I came back again.

"Do you know when that was? A. No, sir, not exactly I don't.

"Q. Has that been since June 6, 1951? A. Yes, sir."

The record shows Lela Baker had given her version of the accident and appellant's counsel then elicited the fact from her that she had not told the police, the taxi driver, the taxicab investigator or anyone else at the scene of the accident that she saw the accident and appellant's counsel then questioned her as to when and to whom she had revealed that she saw the accident.

In answer to questions by appellant's counsel, Lela Baker explained that no one asked her at the scene of the accident about seeing the taxi strike Arthur; that from three to seven days afterwards she told the operator of a shoe shining parlor near the scene of the accident that she saw the accident and gave her name and telephone number to him and later appellees' lawyer and Arthur's mother contacted her. Appellant's counsel cross-examined her relative to her former testimony, as shown by the following extract from the testimony:

"Q. Isn't it a fact that under oath you testified before that you talked to Snake about seven days after this accident and about two days later you talked with Julia over the telephone about this accident? A. I talked with her lawyer, with the lawyer.

"Q. Do you deny you testified to talking with Julia by telephone about two days after you talked with Snake, which was seven days after the accident? A. I don't remember how long.

"Q. Well, about how long was it? A. Well, it wasn't very long after I talked to Snake.

"Q. How long after that was it you talked to Julia by telephone? A. It might have been a couple of days before the lawyer called after I had given my number to Snake."

Thereafter, appellees' counsel took said witness on re-examination and the matters complained of by appellants occurred, as follows:

"Q. Lela, he was talking to you about what you had said under oath. I am going to ask you if it isn't a fact this is all you said under oath in regard to when you saw Julia Davis, and these are questions by Mr. Tom Hartnett beginning at page 44, questions by Mr. Hartnett to you, and I will ask you to tell the Jury if there is anything else you said under oath than what I am reading now?

"Mr. Hartnett: We object to this, Your Honor, this is a redirect questioning of his own witness. I cross examined the witness and she had already answered the question and he is arguing with his own witness.

"The Court: Overrule that objection.

"Q. All right. Question: 'Who have you talked to about this case?' Answer: 'Who have I talked to about this case? I talked to Snake about it.' Question: 'Who else?' Answer: 'I talked to the lawyers.' Question: 'What lawyers?'

"Mr. Hartnett: We object further to his putting in evidence that record except for the purpose of impeaching the witness, and she is his own witness and he is getting all of his evidence in in connection with it to bolster his own witness. We object on that ground.

"The Court: The objection is overruled, but only to such portions of that record as may relate to what has already gone in.

"Mr. Hartnett: I was talking about a different record. He is reading one record and I am talking about another one.

"Mr. McKool: I will ask you if you weren't talking about this record here?

"Mr. Hartnett: I am not and was not.

"Mr. Cozier: What record were you talking about?

"The Court: One at a time, Gentlemen.

"Mr. Hartnett: That testimony isn't what I was talking about at all.

"The Court: Didn't you indicate, Mr. Hartnett, from what record you were reading?

"Mr. Hartnett: He did, and I was talking about another record, and that is why I am objecting to the question. He is going into some previous testimony to bolster his own witness that is inadmissible.

"Mr. White: We are talking about a trial six months later, about the last trial.

"The Court: Let him check the record.

"Mr. McKool: Judge, they are talking about the same record I am.

"The Court: All right, let me have the two records and I will see. (A conference is held at the bench.)

"The Court: Whatever you read there be sure it relates to the same subject matter.

"Mr. McKool: Yes, Your Honor.

"Q. (By Mr. McKool) I will ask you if it isn't a fact under oath on the trial commenced on June 6, 1951, under oath, if these questions, what I have asked you and what I will ask you now, aren't the only questions you were ever asked in that regard about when you talked to Julia Davis?

"Mr. Hartnett: We object to that for the reason it is leading. It is telling the witness how to testify, and arguing with his own witness.

"The Court: Sustain the objection. You have to depend on the record to show what questions are asked. I will sustain the objection to that comprehensive question you have asked there, and it is a leading question also.

"Q. (By Mr. McKool) I will read this record to you, Lela and I will ask you if there is anything else that you have testified in the trial of June 6 under oath other than what I will read you concerning the statements as to whether you talked to Julia Davis?

"The Court: That is the same question in a new form.

"Mr. Hartnett: We object to it.

"Mr. McKool: May it please your Honor

"The Court: You may proceed, with what you have got there. The record itself will show whether there is anything else.

"Mr. Hartnett: Let the record show that we object to it being read because it doesn't refer to what I was talking about on cross examination.

"The Court: I don't know what Counsel was talking about.

"Mr. Hartnett: It is using prior testimony to bolster his own witness, which is inadmissible.

"The Court: It hasn't been made manifest to the Court what the record is.

"Mr. White: Your Honor, please, his question was if in the previous trial, referring to the second trial eight months after this trial, if she didn't testify to certain facts and she said she did.

"The Court: All right. Proceed.

"Q. (By Mr. McKool) 'Who have you talked to about this case?' Answer: 'Who have I talked to about this case? I talked with Snake about it.' Question: 'Who else?' Answer: 'I talked with the lawyers.' Question: 'What lawyers?' Answer: 'Well, the lawyer that interviewed me.' Question: 'Which lawyer was it?' Answer: 'I guess it was this man here (indicating).' Question: 'You don't remember whether or not it was?' Answer: 'It is hard for me to differentiate between white people.' Question: 'The same as it is for white people to differentiate between colored people?' Answer: 'I guess so. They call them by Bill or Joe or something.' Question: 'When did you talk to him?' Answer: 'Well, it was the last part of May.' Question: 'You haven't talked with anybody else?' Answer: 'No.' Question: 'Where did you talk with him?' Answer: 'With him?' Question: 'Yes.' Answer: 'In his office.' Question: 'Did he ask you to come down there?' Answer: 'Yes, he did.' Answer: 'Yes, he did call me.' Question: 'Where did he get your number?' Answer: 'Well, I sent him my number. I mean I sent Julia, this Mrs. Davis, my number. There was a lady passed through Hall and asked a question about the little boy and I asked if the little boy was dead. We thought he was dead ——'

"Mr. White: We object to that; he is reading self serving declarations on the part of the witness.

"The Court: Sustain the objection.

"Mr. Cozier: That is not a self serving declaration of the witness.

"The Court: I sustain the objection to that part.

"Mr. White: We object to his continuing to read the testimony in an attempt to bolster his own witness.

"The Court: Overrule the objection.

"Q. (By Mr. McKool) 'You went to see Julia?' 'No, I gave him my number to Snake. Yes. But he got it to her some other way.'

"The Court: Tell the attorneys what page you are reading from now.

"Mr. Cozier: What page did you read from?

"Mr. McKool: That is page 44, line 2, commencing with line 2 and ending with line 13; and then reading on page 49, line 15 ——— 16. Question: 'Have you seen Julia Davis since the accident?' Answer: 'I saw her in the lawyer's office.' Question: 'She was up there the day you were there?' Answer: 'Yes, she was.' Question: 'That was the first day you ever saw the lawyer?' Answer: 'Yes.' Ending on Line 21. Now, do you recall any other statement * * *.

"The Court: Now, you are circumventing the Court's ruling.

"Mr. McKool: I beg your pardon?

"The Court: I have already ruled on that twice and you are trying to circumvent the court's ruling.

"Mr. McKool: I am sorry, Your Honor. I didn't understand.

"Q. (By Mr. McKool) Lela, while you were there, after this accident occurred, did any officer ask you if you were a witness to this accident? A. No, sir, they didn't.

"Q. Talk out loud. A. They did not.

"Q. Did any investigator from the cab company ask you if you were a witness to this accident? A. They did not.

"Q. Did you talk to Julia Davis before you talked to the lawyer or after you talked to the lawyer? A. Julia called me and asked me if I was Lela Baker over the phone and told me about she got my number, and her little boy was run over. I believe that was before I talked to the lawyer.

"Q. Do you know how long before you talked to the lawyer that was? A. No, sir, I don't.

"Q. That is all."

### Re-Cross Examination

"By Mr. Hartnett: Q. Lela, so there won't be any misunderstanding, so this Jury won't be misled, I want to ask you again if in November, 1951, not June, but November, 1951, isn't it true that you testified under oath that seven days after this accident you went and told Snake you wanted to be a witness, and then about two days after you talked with Snake, you talked with Julia Davis over the telephone? A. I talked with her over the phone, but I don't know how many days after she called me.

"Q. A short time after the accident? A. A short time.

"Q. That is what you testified under oath? A. A short time after I gave him the number.

"Q. That is all."

■ The substance of appellant's claim is that the judgment should be reversed because, although the witnesses had not been impeached, appellees were permitted to prove over appellant's objection, that they had testified to the same facts on another trial. We recognize the correctness of the abstract proposition of law urged by appellant. However, Lela Baker did not testify in answer to question propounded by appellees' counsel that she had testified to the same facts on a former trial. She did so testify in effect, in answer to questions by appellant's counsel. Appellant says that its questions as to her former testimony referred to the second trial, while appellees' questions referred to the first trial. We have found nothing in the record that shows whether this contention, if material, is correct or not and are not referred to any place where it is to be found. The

question we must decide relative to the testimony of Lela Baker is whether, under the circumstances, the mere fact that appellees asked said questions constitutes reversible error. We think not. Without reference to what her former testimony was, Lela Baker clearly explained, in answer to appellant's question, how appellees learned that she saw the accident. The main substance of the testimony sought to be elicited by appellees was introduced by appellant. After careful study of the record, we conclude that these errors did not amount to such a denial of the rights of appellant, "as was reasonably calculated to cause and probably did cause the rendition of an improper judgment". Texas Rules of Civil Procedure, rule 503. See also Hix v. Wirt, Tex.Civ.App., 220 S.W.2d 530 (WR).

Issues 33 and 34 and the answers thereto were as follows:

"(33) What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence will reasonably compensate the plaintiff, Arthur Davis, for the physical pain and suffering, if any, in the past, and in the future, if you find that in reasonable probability there will be any in the future; resulting directly and proximately from the injuries, if any, sustained by the plaintiff, Arthur Davis, on the occasion in question? Answer $5,000.00.

"(34) What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence will reasonably compensate the plaintiff, Julia Davis, for reasonable and necessary hospital and medical bills, if any, in the past, if you find there have been any in the past, and in the future, if you find that in reasonable probability there will be any in the future, and for reasonable and necessary doctor's bills in the past, if you find there have been any in the past, and in the future, if you find that in reasonable probability there will be any in the future; and for the loss of services, if any, to the plaintiff, Julia Davis, occasioned by the injuries and disabilities, if any, of the plaintiff, Arthur Davis, up to the present time and in the future and up to the time when Arthur Davis reaches the age of 21 years, if you find that in reasonable probability there will be any such loss in the future; resulting directly and proximately from the injuries, if any, sustained by the plaintiff, Arthur Davis, upon the occasion in question. Answer: $2,000.00."

■ Appellant's sixth point is that the court erred in including future hospital bills in issue 34, because the evidence is insufficient that there will be such bills. Arthur's doctor testified that he had been treating the boy since April 4, 1951; that he gave him symptoms of being dizzy and having headaches and backaches; that other children made him nervous and dizzy; that he clearly had pain; that he gave him certain tests, including a brain wave test; that the test confirmed the symptoms given by the patient; that it showed he had a brain injury, a bruise of the brain resulting in headaches, irritation, dizziness, restlessness, headaches and a tendency toward behavior disorders. The doctor prescribed limitation of activities and medicine. He testified that Arthur had not recovered; that he will suffer in the future and that it is highly probable that he will continue to suffer disability as a result of his condition; that he will not be able to follow the normal activities of a person of his age. He testified that it was probable that Arthur would require medical and hospital treatment in the future; that a reasonable estimate of the cost of reasonably necessary and proper medical care, including hospital care, during the next three to five years, following the trial, would be $1,500 to $2,500; that the reasonable medical expenses after said period would be $1,500. Such testimony is sufficient to justify the inclusion of the element.

■ Points seven and eight are in substance that the court erred in including in issue 34 the element of loss of Arthur's services to his mother, because the evidence was insufficient that there would be any

compensable loss of Arthur's services, and in authorizing the jury to consider the loss of Arthur's services to his mother until he became twenty-one years of age, because there was no evidence that he would be disabled until he was twenty-one.

There is evidence that before Arthur's injury, on January 1, 1951, he was a happy, bright, intelligent boy, helping his mother with household chores and running errands. He was placed in a nursery school at the age of three and entered the first grade at four. At the time of the accident he was in the third grade. He was held back for two years while in the second grade because he was going too fast. He was in the third grade when he was six. After the accident he was not able to attend school for about six weeks. After the accident he did not get along with his friends as well as he had before. Prior to the accident he had a good disposition, after the accident it was bad. Playing with other children upsets him, he does not get along with them, nor with his mother. He does not now help her in her work nor run errands for her. He is in a highly nervous condition. These changes were caused by the accident and his condition will probably continue far into the future, according to a doctor's testimony. Although an estimate as to the cost of the medical and hospital treatment during the period from three to five years after the trial was given separately from an estimate of such expenses thereafter, there was evidence that his condition would probably continue far beyond the three to five year period following the trial. The doctor testified that there was no way of knowing how long it would last. We think the jury might reasonably conclude from all the evidence that the boy will probably continue to suffer from his condition far beyond the period of three to five years after the last trial.

■ Appellant's ninth and tenth points are that the award of $5,000 and $2,000 to Arthur and his mother, respectively, are excessive are overruled. The testimony deemed sufficient to support said findings has been heretofore mentioned.

Appellant's eleventh point is:

"The trial court erred in submitting an issue on control and the corresponding issues of negligence and proximate cause in that control is an improper issue for a jury because it is multifarious and includes several things such as speed, lookout and circumstances."

R.C.P. 418(c) provides that appellant's brief should contain:

"A brief of the argument, presenting separately or grouped, if germane, the points relied upon for reversal, the argument to include (i) a fair, condensed statement of the facts pertinent to such points, with references to the pages in the record where the same may be found; and (ii) such discussion of the facts and the authorities relied upon as may be requisite to maintain the point at issue. If complaint is made of any charge given or refused, such charge shall be set out in full."

■ Neither the number of the issue, nor the place in the record where it or appellant's objections thereto may be found are shown in the brief. There is no proper statement of the facts pertinent to the point and no reference to the pages in the record where same may be found. The charge is not set out "in full," or otherwise. No real attempt is made to properly brief the point in accord with the rules. See May v. Consolidated Underwriters, Tex.Civ.App., 170 S.W.2d 295 (RWM); Associated Employers Lloyds v. Groce, Tex.Civ.App., 194 S.W.2d 103 (RNRE); Gowan v. Reimers, Tex.Civ.App., 220 S.W.2d 331 (RNRE); Harger v. Cason, Tex.Civ.App., 223 S.W.2d 244; Lovejoy v. Mutual Broadcasting System, Tex.Civ.App., 220 S.W.2d 308; Wiseman v. Robbins, Tex.Civ.App., 230 S.W.2d 371. However, if we should consider said points and determine the issue was not properly submitted, the judgment would not be reversed because the answers thereto could be ignored and the answers to other issues would support the judgment rendered.

The judgment is affirmed.