**UNITED PRESS INTERNATIONAL, INC.,
Appellant,**

v.

**Bruce B. MOHS, Appellee.**

**No. 3894.**

Court of Civil Appeals of Texas.

Eastland.

June 26, 1964.

Rehearing Denied July 24, 1964.

Johnson, Bromberg, Leeds & Riggs, Dallas, for appellant.

Lyne, Blanchette, Smith & Shelton, Dallas, for appellee.

GRISSOM, Chief Justice.

In August, 1961, Mr. Bruce B. Mohs lived in Madison, Wisconsin. He was a licensed commercial plot. He was licensed to fly many types of aircraft, operated an air service, was in the aircraft business and president of Mohs Seaplane Corporation. On August 10, 1961, he flew a seaplane to Dallas. Upon approaching Dallas, he called Love Field trying to find a place to land. Love Field instructed him to go to the Dallas Naval Air Station at Mountain Creek Lake. Upon landing there he was informed that it had no facilities for keeping civilian aircraft overnight. The officer there had him contact a former operator of a Boat Marina at White Rock Lake. He did as suggested and then flew to White Rock Lake. The operator of the Marina there helped him get ashore, where he saw a policeman, Mr. Flowers of the Park Department, who suggested that they go to Park Patrol Headquarters to determine whether he had violated a city ordinance in landing his plane on White Rock Lake. Park Headquarters was operated by Mr. Cook, who called the down town Park Department to ascertain whether there had been a violation of a city ordinance. He was referred to the Northeast Dallas Police substation, north of White Rock Lake. They went to that station and Mr. Mohs talked to Sergeant Veech who helped him find a place to moor his plane. The sergeant contacted the U. S. Corps of Engineers at the Grapevine Reservoir, northwest of Dallas, and the Marina operator there. Both said it was all right for Mohs to land there. Mr. Flowers drove Mr. Mohs back to his aircraft on White Rock Lake and Mohs flew to the Grapevine Lake. That night Mr. Brice Miller, night editor of United Press International, Inc., in Dallas, sent the following story over its wires for publication throughout the world:

"LITENBRITE
DALLAS, TEX., AUG. 11 (UPI)— BRUCE MOHS OF MADISON, WIS., IS THE KIND OF GUY WHO FIGURES ANY PORT IN A PINCH. AND HE WAS . . . PINCHED. HE FLEW HIS PLANE TO DALLAS YESTERDAY AND BY THE TIME HE GOT HERE HE WAS LOW ON FUEL. HIS PLANE HAS PONTOONS . AND NO WHEELS, SO HE LANDED SMACK IN THE MIDDLE OF WHITE ROCK LAKE, A RESIDENTIAL AREA AND PARK INSIDE THE CITY LIMITS.
'HEY, GET THAT THING OUT OF HERE.' A PARK PATROLMAN YELLED.
'SORRY,' MOHS REPLIED. 'NO GAS LEFT.'
THE PATROLMAN CRAWLED INSIDE THE PLANE AND TURNED ON THE IGNITION. THERE WAS A QUARTER OF A TANK LEFT. 'YOU HAVE PLENTY OF GAS TO GET TO LAKE DALLAS (ABOUT 15 MILES AWAY),' HE SAID

MOHS DISAGREED AND ABOUT THIS TIME L. M. COOK, PARK SUPERINTENDENT, A R R I V E D AND ORDERED MOHS ARREST-ED AND HANDCUFFED. HE TOOK HIM TO HIS OFFICE AND BEGAN THUMBING THROUGH A THICK BOOK OF CITY ORDI-NANCES TO FIND ONE THAT FIT.

HE DID, AND HAD MOHS CHARGED WITH FLYING UNDER 2,000 FEET OVER DALLAS AND LANDING ON A PUBLICLY OWN-ED LAKE. 'I GUESS I COULD HAVE LOOKED A LITTLE LONG-ER,' MOHS ADMITTED. 'I SAW PLENTY OF AIRPORTS, BUT NO WATER FOR A PONTOON PLANE AND I JUST SET IT DOWN ON THE FIRST THING THAT LOOK-ED BIGGER THAN A PUDDLE.' "

That story was published in many newspapers, including some in Madison, Wisconsin, where Mohs lived and operated his aircraft business. About eleven days later United Press was told by Mohs' lawyer that statements in said story were false and libelous. On August 26th, United Press sent out the following correction:

"UPI A55
  EDITORS:
ON AUG. 11, UNITED PRESS IN-TERNATIONAL CARRIED A DIS-PATCH FROM DALLAS THAT A PRIVATE PLANE PILOT WAS ARRESTED WHEN HE LANDED HIS PONTOON PLANE ON A CITY LAKE. THE STORY WAS IN ERROR. IF YOU PRINTED IT, WE REQUEST THAT YOU PRINT THE FOLLOWING:
                    –0–
DALLAS, TEX., AUG. 26 (UPI)—UNITED PRESS INTERNATION-AL ERRONEOUSLY REPORTED ON AUG. 11 THAT BRUCE MOHS OF MADISON, WIS., WAS AR-RESTED AND CHARGED WITH VIOLATION OF A CITY ORDI-NANCE FOR LANDING HIS PON-TOON-EQUIPPED PLANE ON A CITY LAKE. MOHS, WHO IS A LICENSED COMMERCIAL PILOT, LANDED AT THE LAKE ON A FLIGHT FROM MADISON TO DALLAS ON AUG. 10. A UPI DISPATCH SAID HE WAS OR-DERED ARRESTED AND HAND-CUFFED. HE WAS NOT ARREST-ED, NOR WAS HE HANDCUFFED. PARK SUPERINTENDENT L. M. COOK, WHO SUPERVISES AC-TIVITIES AT THE LAKE, WAS QUOTED AS SAYING MOHS WOULD BE CHARGED UNDER A CITY ORDINANCE FORBID-DING FLIGHTS IN DALLAS UN-DER 2,000 FEET AND LANDING ON A PUBLICLY OWNED LAKE. ACTUALLY, MOHS WAS NOT CHARGED. NO SUMMONS WAS ISSUED BY POLICE.
MOHS SAID THAT AS HE AP-PROACHED DALLAS, HE CON-TACTED DALLAS LOVE FIELD, THE MAIN CITY AIRPORT, AND WAS TOLD TO PROCEED TO MOUNTAIN CREEK LAKE, SINCE HIS PLANE HAD NO WHEELS. HE SAID THE NAVAL AIR STA-TION AT THE LAKE COULD NOT PROVIDE MOORING FOR HIS AIRCRAFT, SO HE CONTACTED A FORMER BOAT DOCK OPERA-TOR AT WHITE ROCK LAKE WHO TOLD HIM HE COULD LAND AND MOOR HIS PLANE THERE. THE UPI DISPATCH OF AUG. 11 QUOTED MOHS AS TELL-ING A PARK PATROLMAN HE WAS 'OUT OF GAS.' THE PA-TROLMAN SAID LATER MOHS DID NOT SAY THIS, NOR DID THE PATROLMAN CLIMB INTO THE PLANE TO CHECK ON THE AMOUNT OF GAS LEFT IN THE TANKS.
UPI REGRETS ANY INCONVENI-ENCE OR EMBARRASSMENT

THE ORIGINAL STORY MAY HAVE CAUSED MOHS.
-0-
BUOS—PLS. RELAY ALL CIRCUITS WHERE ORIGINAL WAS CARRIED.
UPI NEW YORK"

Mr. Mohs sued United Press International, Inc. for actual and exemplary damages caused by said alleged libel. Issues were submitted to a jury and answered as follows:

"SPECIAL ISSUE NO. 1

"Do you find from a preponderance of the evidence that the statement caused to be published by the Defendant (United Press International) 'Bruce Mohs, Madison, Wisconsin, is the kind of a guy who figures any port in a pinch. And he was * * * pinched' was a libel as that term is defined for you in this charge?

"Answer 'Yes' or 'no'

"ANSWER: *yes*

"SPECIAL ISSUE NO. 2

"Do you find from a preponderance of the evidence that the statement caused to be published by the Defendant (United Press International) 'Hey, get that thing out of here,' a park patrolman yelled. 'Sorry', Mohs replied. 'No gas left.' The patrolman crawled inside the plane and turned on the ignition. There was a quarter of a tank left. 'You have plenty of gas to get to Lake Dallas (about 15 miles away)' he said'. was a libel as that term is defined for you in this charge?

"Answer 'yes' or 'no'.

"ANSWER: *yes*

"SPECIAL ISSUE NO. 3

"Do you find from a preponderance of the evidence that the statement caused to be published by the Defendant (United Press International) 'Mohs disagreed. L. M. Cook, Park Superintendent, arrived and ordered Mohs arrested and handcuffed.' was a libel as that term is defined for you in this charge?

"Answer 'yes' or 'no'

"ANSWER: *yes*

"SPECIAL ISSUE NO. 4

"Do you find from a preponderance of the evidence that the statement caused to be published by the Defendant (United Press International) 'He had Mohs charged with flying under 2,000 feet over Dallas and landing on a publicly owned lake.' was a libel as that term is defined for you in this charge?

"Answer 'yes' or 'no'

"ANSWER: *yes*

"SPECIAL ISSUE NO. 5

"Do you find from a preponderance of the evidence that the Plaintiff (Mohs) sustained any injuries proximately resulting from the publishing of said statements inquired about in Special Issues Nos. 1, 2, 3 or 4?

"Answer 'yes' or 'no'

"ANSWER: *yes*

"If you have answered 'yes' to the preceding special issue, then you will answer the following special issue; otherwise, you need not answer same.

"SPECIAL ISSUE NO. 6

"What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence would reasonably compensate plaintiff (Mohs) for injuries, if any, done to Plaintiff (Mohs) as the proximate result, if any, of the publications of said statements inquired about in Special Issues Nos. 1, 2, 3 or 4?

"Answer in dollars, if any, and cents, if any, or 'none'.

"ANSWER: *$2,500.00 (Two Thousand, Five Hundred Dollars and No/100)*

"In answering the foregoing question, you may consider any injuries sustained to the plaintiff's (Mohs) character and reputation as a professional pilot, if any, and as a man, if any, and mental anguish, if any, embarrassment, if any, shame, if any, humiliation, if any, pecuniary loss, if any, or loss of business, if any, which have been sustained, if any, proximately caused by the publication of the statements inquired about in Special Issues Nos. 1, 2, 3 or 4.

"In connection with Special Issue No. 6, you are instructed that, in determining your answer thereto you may, in mitigation or reduction of the amount of damages, if any, consider such evidence before you of the facts and circumstances surrounding the said publication of said statements, inquired about in Special Issues Nos. 1, 2, 3 or 4, any retraction, apology or correction and the intention with which the said publication was made.

"If you have answered Special Issue No. 6 in any amount, then you will answer the following special issue; otherwise, you need not answer same.

" 'Exemplary damages' are damages which are assessed against a party where such party has acted with malice, and which damages are assessed against such party for the purpose of punishing such party, and also for the purpose of setting a wholesome example, if any, to others.

" 'Malice', as used in this charge, is meant a willful or wanton act or gross indifference of the rights of others, and means an act done with the specific intention to injure the person that was injured, or acts done with such utter recklessness as to indicate a disregard of consequences.

"SPECIAL ISSUE NO. 7

"Do you find from a preponderance of the evidence that the publication of the statements inquired about in Special Issues Nos. 1, 2, 3 or 4 amounted to malice, as that term is defined in this charge?

"Answer 'yes' or 'no'

"ANSWER: *yes*

"If you have answered 'yes' to the preceding special issue, then you will answer the following special issue; otherwise, you need not answer same.

"SPECIAL ISSUE NO. 8

"What sum of money, if any, do you find from a preponderance of the evidence should be awarded against the defendant (United Press International) by way of exemplary damages herein?

"Answer in dollars, if any, and cents, if any, or 'none'.

"ANSWER: $5,000.00 *(Five Thousand Dollars and No cents.)*"

The court rendered judgment for Mohs against United Press International, Inc., for $2,500.00 actual damages and $5,000.00 exemplary damages. United Press International, Inc., has appealed. However, it complains only of the award of exemplary damages.

As shown above, in answer to issues 7 and 8 a jury found that publication of the statements inquired about amounted to malice and that $5,000.00 should be awarded by way of exemplary damages. Appellant's points are that (1) the court erred in overruling its motion to disregard the answers to issues 7 and 8; that (2) the court erred in submitting issue 7 over its objection that there was no evidence to support a finding thereon; that (3) the court erred in submitting issue 8 over appellant's objection that there was no evidence to support a finding thereon and (4) that the undisputed evidence showed there was no malice on the part of Miller. The substance of appellant's contentions is that there was no evidence of malice and, therefore, no evidence to support the award of exemplary damages.

There was no truth in most of the story about appellee that was sent out and caused to be published by appellant. The quoted statement of the Park patrolman telling Mohs to "get that thing out of here", Mohs answered that he couldn't because he was

out of gas and that the patrolman investigated and learned Mohs was lying, that he still had a quarter of a tank of gas, and the statement that about this time the Park Superintendent arrived and ordered Mohs arrested and handcuffed and that Mohs was charged with flying over Dallas at less than 2,000 feet and landing on a publicly owned lake in violation of a city ordinance were all completely false. Said quoted statements were not made. Mohs was not ordered arrested or handcuffed. Mohs was not caught lying about being out of gas. Mohs was not charged with any offense.

Before Miller wrote and sent out that story, another story about Mohs landing his seaplane on White Rock Lake had been written at and sent from appellant's same office that night. It contained no statement that Mohs had been ordered arrested and handcuffed; that Mohs had been caught lying or that he had been charged with any offense. Miller knew about that story. Miller did not know who wrote the first story or what information the writer thereof had and he made no effort to find out.

Miller testified that a Mr. DeHarrow told him that he saw and heard the things related in the story; that he had known DeHarrow for a year; that he had given Miller stories before which had been accurate and he believed what DeHarrow told him. DeHarrow did not testify. Mr. Fallon, the Southwestern Division News Manager for United Press International testified with reference to DeHarrow that he was one of appellant's string correspondents; that "A string correspondent is someone who is not employed by us as a staff correspondent who works for another news media such as newspaper, radio, television station, and is a newsman per se, that is an editorial staffer, and he provides news to us on what we call a string basis; that is, when he has a story which he comes across which he covers or he gives the story to the wire service." Between the writing and sending of the first story and the sending out of the second, some one at appellant's office called the police department and learned that, so far as was known at police headquarters, Mr. Mohs had not been charged with any offense. Neither Mr. Miller, nor any one else for appellant attempted to verify the story by inquiring at said police substation, nor to verify it by contacting the quoted park patrolman, the quoted park superintendent, or any one else. With such lack of verification, with the only police contacted reporting that, so far as was known at police headquarters, no charge of any kind had been filed against Mohs, with knowledge that appellant's previously written story did not contain any of the statements found to be libelous, with a question of the truth of all the statements found to be libelous thus raised, nevertheless, appellant sent out the story for the amusement of newspaper readers throughout the world.

The controlling question is whether there was any evidence of probative force to sustain the finding of malice and the consequent award of exemplary damages. Gross negligence constituting ground for exemplary damages has been said to be that entire want of care which would raise a belief that the act complained of was the result of conscious indifference to the rights of the person to be affected by it. Bennett v. Howard, 141 Tex. 101, 170 S.W.2d 709, 712. In that case the court said at page 713 of 170 S.W.2d:

> "In order for respondents to recover exemplary damages * * * it was necessary for them to show affirmatively that the petitioners, acting through their superintendent, Smith, disclosed an 'entire want of care' or a 'conscious indifference' to the rights of those working under Smith at the time of the explosion."

See also Sheffield Division, Armco Steel Corp. v. Jones, Tex., 376 S.W.2d 825; Texas Pacific Coal & Oil Company v. Robertson, 125 Tex. 4, 79 S.W.2d 830, 98 A.L.R. 262, the annotation at page 269, and 17 Tex. Jur.2d 245; Houston Chronicle Publishing Co. v. Quinn, Tex.Civ.App., 184 S.W. 669,

675, (Writ Ref.); Houston Chronicle Publishing Co. v. Bowen, Tex.Civ.App., 182 S.W. 61, 65, (Writ Ref.). In answering this question we are required to consider all the testimony from the standpoint most favorable to appellee. To reverse the judgment we must determine that there was no evidence of probative force upon which the jury could have made said findings. Burt v. Lochausen, 151 Tex. 289, 249 S.W. 2d 194, 199.

It is evident that either DeHarrow or Miller made up most of the story, quotes and all, for the purpose of having an amusing story published in the newspapers, without any regard for its effect on Mohs. It appears to be immaterial which one manufactured it. Under the testimony of Mr. Fallon, DeHarrow was one of appellant's string correspondents, who provided news for appellant on a "string basis". But, regardless thereof, when the story holding Mohs up to ridicule was sent out by Miller the only attempt to have it verified by the police had been met with notice that police headquarters had no information that Mohs had been charged with anything. Furthermore, there was then in his office, which fact was known by Miller, a story, previously written that day, about the same thing which did not indicate that Mohs had been caught lying; that he had done a silly thing, that he had been ordered arrested and handcuffed, and had been charged with violating the law by the operation of his plane. Miller knew that the story previously written in his office was materially different from the story related by DeHarrow. He didn't inquire who wrote it or what that writer knew. But, he did know that it did not jibe with the story he sent out or with the information from police headquarters. Neither the quoted policeman, Mohs, nor the quoted park superintendent was attempted to be contacted. Miller then had many reasons to question the truth of the ludicrous story attributed to DeHarrow. Nevertheless, without investigating the truth thereof, which investigation was suggested by many circumstances,

he was so pleased with a funny story holding Mohs up to ridicule that he forthwith sent it out for all to read and be amused at Mohs' expense.

■ Fabrication of this libelous story was a willful and wanton act sufficient to support a finding of malice. If it was the product of DeHarrow's fertile imagination and if appellant was not responsible for his acts, nevertheless, the acts of Miller in rewriting and sending out the story without verification, despite the many facts known to him that raised questions as to its truthfulness, raised issues of fact as to whether there was such a want of care as could raise the belief that his acts were the result of a conscious indifference to the rights of Mohs. There was evidence of probative force to support the jury's finding of malice and the award of exemplary damages.

The judgment is affirmed.