**BRITISH OVERSEAS AIRWAYS CORPORATION, Appellant,**

v.

**TOURS AND TRAVEL OF HOUSTON, INC., Appellee.**

No. 17061.

Court of Civil Appeals of Texas, Houston (1st Dist.).

June 1, 1978.

Rehearing Denied July 6, 1978.

**890**

Funderburk & Funderburk, Larry B. Funderburk, Don Karotkin, Houston, for appellant.

Talbert, Giessel & Stone, John W. Berkel, Houston, for appellee.

EVANS, Justice.

This action for damages, based upon allegations of libel, breach of contract and tortious interference with business relationship, was brought by the plaintiff, Tours and Travel of Houston, Inc., a travel agency, against the defendant, British Overseas Airways Corp. The basis of the plaintiff's claim is a telex message sent by British Airways to International Air Transport Association on May 19, 1972, as follows:

"This is to advise that Tours and Travel of Houston, Inc., 936 Mellie Esperson Building, Houston, Texas, Code 87762, is in default to BOAC in the amount of $3,572.18."

International Air Transport Association (IATA) is an organization of international airlines engaged in providing international air transportation. Another association, Air Traffic Conference of America (ATC) is an association of domestic airlines, providing the same function as IATA on behalf of member airlines with respect to domestic air service. Tours and Travel was an approved travel agency for both associations.

Any airline which became a member of IATA or ATC agreed to be bound by the rules and regulations of that association to which it belonged. A travel agent such as Tours and Travel, desiring to sell international or domestic air transportation tickets for a particular airline, had to be approved by the association in which the airline had a membership, and as a condition to such approval the agent was required to sign a sales agreement, agreeing to abide by all of the rules and regulations promulgated by that association. A function of each airline association was the adoption of rules and regulations concerning the procedures to be followed by travel agencies in selling airline tickets.

In the event a travel agent did not comply with the procedures established for reporting ticket sales or for remitting the monies received from such sales, the particular airline affected might report to the applicable association the fact that the travel agent was "in default of" its regulations. Upon receipt of an airline's notification that a travel agent was in default, the association could report such default to each of its airline members with which the travel agent did business. The airlines receiving the association's notification would then withhold and refuse to pay to the travel agent, until the default had been remedied, all commissions owed and unpaid and all commissions subsequently earned.

Since some international airlines did business with travel agents within the United States, the authority of IATA and ATC to some extent overlapped, and coordinating procedures were adopted by the associations so that travel agents approved by both organizations for the sale of domestic and international airline tickets could use the reporting procedures of the ATC, rather than the procedures of the IATA. Tours and Travel, which had been approved as a travel agent by both associations, therefore, used only the reporting procedures of the ATC and was not on a reporting basis with the IATA. Thus, Tours and Travel always followed ATC reporting procedures in the sale of British Airways' tickets.

Beginning in January 1971, British Airways sent a number of "agency debit memos" to Tours and Travel, seeking refund of commissions allegedly due as a result of flight cancellations and refunds made by British Airways to passengers who had purchased tickets through Tours and Travel. The validity of these claims was questioned by Tours and Travel and the testimony is in

dispute concerning the extent to which the parties' respective representatives made diligent, good faith effort to furnish the other party with documentation as to the accuracy of the items in question.

On May 19, 1972, the claims had not been resolved, and British Airways sent the above-quoted telex message to IATA, advising that Tours and Travel was in default in the amount of $3,572.18. As a result of this message, Tours and Travel was placed in a default status with IATA and its member airlines for approximately three months. When the parties finally reconciled the disputed accounts, it was determined that the total amount owed by Tours and Travel to British Airways, after deducting commissions withheld from June 1971 to the time of reconciliation, was in the sum of $391.47.

In response to special issues the jury found (1) that Tours and Travel was not in default; (2) that the telex message had been sent by British Airways with malice; (3) that the action of British Airways in sending the message was not done in good faith; (4) that Tours and Travel had sustained actual damages in the amount of $25,000.00; and (5) that Tours and Travel was entitled to exemplary damages in the amount of $7500.00. Based on the jury's verdict, the trial court entered judgment in favor of Tours and Travel in the amount of $32,500.00.

It is the position of British Airways that the evidence conclusively established that Tours and Travel was in default on May 19, 1972, and that the jury's finding to the contrary is without legal or factual support in the evidence and is against the great weight and preponderance of the evidence. British Airways contends that since the undisputed evidence shows that Tours and Travel owed certain monies to it on May 19, 1972, there was no basis upon which the jury could have concluded that Tours and Travel was not in default of its obligations on that date.

The pertinent regulation of the IATA provides as follows:

"Declaration of Default for Non-Remittance

"(6) If any agent fails to remit the monies due to any Member, so as to reach the Member within a further period of ten days after the appropriate remittance date as provided in Paragraph (2) or (3) as appropriate, such Member shall immediately declare the agent in default by telegraphing . . . the Agency Administrator. (. . .) Similarly, upon notification by the Air Traffic Conference of America that an IATA Passenger Sales Agent has failed to remit monies due and is in default according to its rules, the Agency Administrator shall immediately so advise all IATA Members and Members of the Agency Administration Board. (. . .)" (International Air Transport Association Resolution 810[a] USA, Section G, Subsection 6)

The paragraphs (2) and (3) referred to in this regulation set forth the reporting and billing procedures applicable to travel agencies approved by the IATA.

It is the contention of Tours and Travel that the default provision set forth in Subsection 6 of the IATA resolution was inapplicable to it because it had never been required to use the reporting procedures of the IATA and was, therefore, not covered by the default regulations of that association. Tours and Travel argues that in order to be in default under the IATA regulations, a travel agency must have failed to comply with the reporting and billing procedures set forth in paragraphs (2) and (3) of the regulations promulgated by that association. Thus, Tours and Travel contends that the evidence supports the jury's findings that it was not in default on the date in question and that the jury's verdict is not against the great weight and preponderance of the evidence.

British Airways concedes that Tours and Travel had not used the reporting procedures of the IATA and, therefore, was not required to comply with the reporting and billing procedures of paragraphs (2) and (3) of the IATA regulations. It also admits that the telex message which it sent to the IATA was issued pursuant to the provisions of IATA's subsection 6 resolution. It is the

position of British Airways that since the term "default" is not defined in the IATA regulations, the term should be given its commonly accepted meaning of "a failure to pay financial debts." .

The claims represented by the British Airways agency debit memos were for commissions received by Tours and Travel with respect to ticket sales to customers who had later changed, cancelled or cashed in their tickets and received from British Airways a refund of the purchase price. Thus, these claims arose not from the failure of Tours and Travel to timely report the ticket sales or to make remittance of the sales proceeds, but rather from subsequent events over which Tours and Travel had no control.

It is the argument of British Airways, however, that since the claims arose from the sale of "transportation documents", the transactions were within the purview of the IATA regulations imposing a duty on the airline to report a travel agent in default. It further argues that it was authorized to communicate to IATA the fact that Tours and Travel had failed to meet its financial obligations on the date in question, regardless of whether Tours and Travel was "technically" within the purview of the IATA regulations.

■ Since Tours and Travel was not required to follow the reporting and billing procedures set forth in paragraphs (2) and (3) of the IATA regulations, it did not "fail to remit monies due" as provided in those paragraphs and, therefore, it was not in default under the IATA regulations. Although Tours and Travel may have owed certain sums of money to British Airways with respect to unearned commissions, such indebtedness was not within the scope of the default provision of the IATA regulations. The jury was at liberty to determine from the evidence before it that Tours and Travel was not in default on May 19, 1972, and its finding is not against the great weight and preponderance of the evidence.

It is also the position of British Airways that the trial court erred in denying its motion to receive and file the initial verdict of the jury and that it also erred in in-structing the jury to return to the jury room for a reconsideration of its answers to special issues 2 and 3 and in receiving and filing the jury's reconsidered verdict.

The jury initially found that the default message had been sent with malice but that the action of British Airways in sending the message had been done in good faith. The trial court concluded that these answers were in conflict, and it overruled British Airways' motion to receive and file the verdict and returned the jury to the jury room for a reconsideration of its answers to those two issues. The jury then changed its answer to the third special issue, finding that British Airways' actions were not done in good faith, and its verdict with such changed finding was received and filed by the trial court.

British Airways contends that the jury's initial findings presented merely an "apparent conflict," which could have been and should have been reconciled by the trial judge. British Airways argues that in rendering its initial verdict, the jury could have determined that British Airways had acted maliciously in sending the message in the sense that it had wished to exert financial pressure in order to coerce Tours and Travel to pay its debts, and that the jury could further have concluded that British Airways believed at that time that it had the legal or contractual right or duty to send the message, and, thus, was acting in good faith. British Airways argues that the issue of good faith was an affirmative defense, which was based upon express provisions in the contract in effect at that time, and that the jury's affirmative answer to the good faith issue did not negate an essential element of the plaintiff's cause of action, but rather established its own affirmative defense.

■ In a libel action the issues of malice and good faith are pertinent to the defense of qualified privilege. A communication on a subject in which the author or the public has an interest or with respect to which the author has a duty to perform to another owing a corresponding duty may

constitute a qualified or conditional privilege. In order for the defense to be applicable, the privilege must have been exercised in a lawful manner and for a lawful purpose. *Buck v. Savage*, 323 S.W.2d 363, 372 (Tex.Civ.App.—Houston 1959, writ ref'd n. r. e.). Thus, the defense of qualified privilege is available only if the evidence shows that the communication was made in good faith and without malice. *Zarate v. Cortinas*, 553 S.W.2d 652, 655 (Tex.Civ.App. —Corpus Christi 1977, no writ). Malice has been equated with "a want of good faith." *Buck v. Savage*, supra.

■ Where the defense of privilege exists in a libel action, the communication is presumed to have been exercised in good faith and without malice. *Cooksey v. McGuire*, 146 S.W.2d 480, 483 (Tex.Civ.App. —Eastland 1940, no writ). In the case at bar it was the burden of Tours and Travel to establish that the action of British Airways in sending the telex message was prompted or partially prompted by malice or want of good faith. *Dun & Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896, 898 (Tex. 1970). Tours and Travel met this burden by offering proof and obtaining a finding that British Airways had acted with malice.

■ Since the jury found, in response to special issue no. 2, that British Airways acted with malice in sending the telex message, its initial response to special issue no. 3, finding that British Airways had acted in good faith, created a conflict between the two findings. The two findings, considered separately and taken as true, would compel the rendition of different judgments, and the trial court properly returned the jury to the jury room for a reconsideration of the two conflicting findings. *Little Rock Furniture Mfg. Co. v. Dunn*, 148 Tex. 197, 222 S.W.2d 985 (1949).

British Airways also contends that the evidence conclusively established that its action in sending the telex was done in good faith and not with malice and that the jury's findings to the contrary are without legal and factual support in the evidence and are against the great weight and preponderance of the evidence.

■ A finding of malice may be supported by evidence that a false credit report has been circulated with knowledge of its falsity or with a reckless disregard of its truth and accuracy. *Dun & Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896 (Tex.1970); 40 A.L.R.3d 1049, 1055. The evidence was in dispute as to whether British Airways had acted reasonably in determining the accuracy of the disputed agency debit memos and the jury could have decided from the evidence that Tours and Travel was justified in refusing to pay the disputed claims until it could be determined that the accounts were accurate. British Airways admitted that Tours and Travel had been placed in default with IATA because it "wanted the debts paid," and that it knew its action in sending the telex message would cut off all income to Tours and Travel and could ruin the agency's business. The jury could have concluded from the evidence that British Airways knew the default provision of the IATA regulations did not apply to Tours and Travel, and that with knowledge of that fact, British Airways sent the telex message to IATA solely for the purpose of coercing Tours and Travel to pay the disputed claims. The evidence supports the jury's finding of malice and its finding is not against the great weight and preponderance of the evidence.

British Airways also attacks the jury's finding of actual damages, contending that the evidence is legally and factually insufficient to support such finding and that such finding is grossly excessive in amount. British Airways argues that the record shows that Tours and Travel did not sustain any actual loss or expense as a result of the sending of the telex message and that Tours and Travel was not entitled to recover any amount other than such loss as the evidence might show it had sustained as a result of that occurrence.

Dr. William Kretlow, an economic analyst, testified that there was no market for travel agencies and that he had used the capitalization of income method in evaluating the Tours and Travel business. Dr.

Kretlow testified that according to his analysis, the value of the business immediately prior to May 19, 1972 was approximately $40,000.00 and that immediately after August 13, 1972, when the default status was "lifted" by British Airways, the value of the business was virtually zero. Dr. Kretlow testified that his analysis was based upon the income tax records of Tours and Travel, its reliance on IATA commissions, its lack of credit and its inability to earn commissions after the default notice had been issued.

The income tax records of Tours and Travel were introduced in evidence. Based upon these records and the testimony given with respect thereto, the jury could have concluded that Tours and Travel had made a profit of $9,000.00 in 1970, that it would have made a profit of $7500.00 in 1971 except for a bad debt, and that in 1972 the year in which the default notice was issued, Tours and Travel lost $10,000.00, and the following year, 1973, it lost $1542.00. In 1974 it reported a profit of $6201.00.

Where a libelous publication has caused damage to a business, such as that involved in the case at bar, there is no set rule for the assessment of damages. *Eidinoff v. Andress*, 321 S.W.2d 368 (Tex.Civ. App.—El Paso 1959, writ ref'd n. r. e.). If the libeled party's business is injured as a direct and proximate result of the defamation, evidence concerning the extent of such injury is a proper matter for the jury's consideration. The amount of compensation is ordinarily a question of fact, and the jury's determination of the amount of damages will not be disturbed unless an abuse of discretion is shown. *Express Publishing Co. v. Gonzalez*, 350 S.W.2d 589, 592 (Tex. Civ.App.—Eastland 1961, writ ref'd n. r. e.).

There was testimony that the years 1969, 1970 and 1971 were good years for travel and that a travel agent's potential for the year 1972 was excellent. There was also testimony that when the commission income of Tours and Travel was "cut off" by the default notice, Tours and Travel was unable to pay the salaries for its clerical employees and was unable to borrow funds to continue the level of its business. There was testimony that commissions which had been earned by Tours and Travel during the default period were not paid promptly and that some period of time passed before Tours and Travel could bring the financial condition of its business back to its previous level. The jury's finding has support in the evidence and its verdict will not be disturbed.

In its remaining points British Airways complains that there is no evidence and insufficient evidence to support the jury's finding of exemplary damages and that the amount of its finding is grossly excessive.

Exemplary damages may be allowed in a libel action where the libeled party establishes the existence of a wilful or wanton act sufficient to support a finding of malice. *United Press International, Inc. v. Mohs*, 381 S.W.2d 104, 110 (Tex.Civ. App.—Eastland 1964, writ ref'd n. r. e.). The evidence supports the jury's award of exemplary damages and the amount of its assessment is reasonable in proportion to the amount of actual damages found. *Southwestern Investment Co. v. Neeley*, 452 S.W.2d 705 (Tex.1970).

In view of the disposition made of the points of error raised by British Airways, it is unnecessary to consider whether the trial court's judgment may be sustained upon the other theories of recovery alleged by Tours and Travel.

The trial court's judgment is affirmed.