FRANK B. HALL & CO., INC., et al Appellant,

v.

Larry W. BUCK, Appellee.

No. C14-82-234CV.

Court of Appeals of Texas, Houston (14th Dist.).

July 26, 1984.

Irving C. Stern, Dunn, Stern, Lipstet, Singer & Hirsch, Houston, for appellant.

Franci N. Beck, Susman, Godfrey & McGowan, Houston, for appellee.

Before JUNELL, MURPHY and SEARS, JJ.

## OPINION

JUNELL, Justice.

Larry W. Buck (Buck or appellee) sued his former employer, Frank B. Hall & Co. (Hall or appellant), for damages for defamation of character, misrepresentation, and breach of contract. By unamimous verdict, a jury found damages for breach of contract, defamation of character and exemplary damages. The court entered judgment for appellee for $1,905,000.00 in damages, plus interest, attorney's fees and costs of court. For the reasons set forth below, we affirm.

Appellee, an established salesman in the insurance business, was approached in the spring of 1976 by a representative of Hall with a prospective job offer. Appellee was then an executive vice-president of the insurance firm of Alexander & Alexander, and in the previous year he generated approximately $550,000.00 in commissions for the firm. He was the top producer in Alexander's Houston office and was ranked nationally among the top five salesmen for Alexander. After several meetings, Buck accepted Hall's offer of employment and began working for Hall on June 1, 1976. Hall agreed to pay Buck an annual salary of $80,000.00 plus additional compensation equal to seven and one-half percent of net retained commissions for each year to a maximum commission of $600,000.00, plus fringe benefits. The agreement was to be for a three year period. Several Alexander employees followed Buck to Hall's office. During the next several months Buck generated substantial commission income for Hall and succeeded in bringing several major accounts to the firm.

In October, 1976, Mendel Kaliff, then president of Frank B. Hall & Co. of Texas, held a meeting with Buck and Lester Eckert, Hall's office manager and a former Alexander employee. Kaliff informed Buck his salary was being reduced to $65,000.00 and that Hall was eliminating Buck's incentive and profit sharing benefits. Kaliff told Buck these measures were being taken because of Buck's failure to produce sufficient income for Hall. However, Kaliff added that if Buck could generate $400,000.00 net commission income by June 1, 1977, his salary and benefits would be reinstated retroactively.

On March 31, 1977, at another impromptu meeting, Kaliff and Eckert abruptly fired Buck and instructed him not to return to Hall's offices. Buck sought employment with several other insurance firms, but his efforts were fruitless. Distraught at having lost his job and being unable to find suitable employment in the insurance business, Buck hired an investigator, Lloyd Barber, in an attempt to discover Hall's true reasons for firing him. This suit is based upon statements made by Hall employees to Lloyd Barber and to Charles Burton, a prospective employer, and upon a note written by Virginia Hilley, a Hall employee. Appellant brings eighty points of error, which will be grouped in thirteen categories.

In points one through thirteen, appellant challenges the legal and factual sufficiency of the evidence to support the jury's findings that the statements to Barber were published. Hall urges the statements were invited as a matter of law.

Lloyd Barber contacted Mendel Kaliff, Lester Eckert and Virginia Hilley and told them that he was an investigator, Buck was being considered for a position of trust and responsibility, and Barber was seeking information about Buck's employment with Frank B. Hall & Co. Barber testified that he had interviewed Kaliff, Eckert and Hilley on separate occasions in September and October of 1977, and had tape recorded the conversations. Appellee introduced into evidence Barber's properly authenticated investigative reports, which were based on these taped interviews. The report shows Kaliff remarked several times that Buck was untrustworthy, and not always entirely truthful; he said Buck was disruptive, paranoid, hostile and was guilty of padding his expense account. Kaliff said he had locked Buck out of his office and had not trusted him to return. He charged that Buck had promised things he could not deliver.

Eckert told Barber that Buck was horrible in a business sense, irrational, ruthless, and disliked by office personnel. He described Buck as a "classical sociopath,"

who would verbally abuse and embarrass Hall employees. Eckert said Buck had stolen files and records from Alexander & Alexander. He called Buck "a zero," "a Jekyll and Hyde person" who was "lacking in compucture [sic] or scruples."

Virginia Hilley told Barber that Buck could have been charged with theft for materials he brought with him to Hall from Alexander & Alexander.

 Any act wherein the defamatory matter is intentionally or negligently communicated to a third person is a publication. In the case of slander, the act is usually the speaking of the words. RESTATEMENT (SECOND) OF TORTS § 577 comment a (1977). There is ample support in the record to show that these individuals intentionally communicated disparaging remarks to a third person. The jury was instructed that "Publication means to communicate defamatory words to some third person in such a way that he understands the words to be defamatory. A statement is not published if it was authorized, invited or procured by Buck and if Buck knew in advance the contents of the invited communication." In response to special issues, the jury found that the slanderous statements were made and published to Barber.

Hall argues that Buck could and should have expected Hall's employees to give their opinion of Buck when requested to do so.

Hall is correct in stating that a plaintiff may not recover for a publication to which he has consented, or which he has authorized, procured or invited, *Lyle v. Waddle*, 144 Tex. 90, 188 S.W.2d 770 (1945); and it may be true that Buck could assume that Hall's employees would give their opinion when asked to do so. However, there is nothing in the record to indicate that Buck knew Hall's employees would *defame* him when Barber made the inquiries. The accusations made by Kaliff, Eckert and Hilley were not mere expressions of opinion but were false and derogatory statements of fact. There is sufficient evidence that Buck had no knowledge of what Kaliff, Eckert and Hilley would say to Barber.

Buck testified that he was fired abruptly and unexpectedly on March 31, 1977. Buck had generated $308,000.00 in commissions for Hall at the time of his termination on March 31; he testified he easily could have reached or exceeded his goal of $400,000.00 had he been allowed to work until June 1. Buck testified that Kaliff's reason for firing him was untenable, "He said that I was being fired because I had not fulfilled my commitment and I had not written a sufficient amount of business to justify keeping me on. It was economically unsound for them to do so." Barber stated that he was hired for the specific purpose of ascertaining the reasons for Buck's termination, and that he was not aware of any lawsuits when he spoke to Kaliff, Eckert and Hilley. The evidence is sufficient to support the jury's finding that the statements were not invited, and the jury was entitled to believe that appellee did not know why Hall had fired him and did not set up the Barber interviews to create a cause of action for defamation.

Hall also argues that the evidence shows conclusively that Barber was acting as Buck's agent and that he tricked the Hall employees into making derogatory remarks.

 A defamer cannot escape liability by showing that, although he desired to defame the plaintiff, he did not desire to defame him to the person to whom he in fact intentionally published the defamatory communication. The publication is complete although the publisher is mistaken as to the identity of the person to whom the publication is made. RESTATEMENT (SECOND) OF TORTS § 577 comment e (1977). Likewise, communication to an agent of the person defamed is a publication, unless the communication is invited by the person defamed or his agent. RESTATEMENT § 577 comment e. We have already determined that the evidence is sufficient to show that Buck did not know what Kaliff, Eckert or Hilley would say and that he did not procure the defamatory statements to create a lawsuit. Thus, the fact that Barber may have been acting at

Buck's request is not fatal to Buck's cause of action. There is absolutely no proof that Barber induced Kaliff, Eckert or Hilley to make any of the defamatory comments. Points of error one through thirteen are overruled.

Hall's points of error fourteen through twenty-five focus on statements made by Lester Eckert to Charles Burton, then president of another large insurance brokerage firm, Carroon & Black. Burton testified that Buck contacted him in the summer of 1977 to discuss employment possibilities with Carroon & Black. When asked why he was no longer with Frank B. Hall & Co., Buck told Burton that he "really [didn't] know." Because he was seriously interested in hiring Buck, Burton telephoned Eckert to find out the circumstances surrounding Buck's termination. Eckert told Burton, "Larry didn't reach his production goals." Burton, who was very familiar with Buck's exceptional record as a good producer in the insurance business, was surprised at Eckert's response. When pressed for more information, Eckert declined to comment, stating, "I can't go into it." Burton then asked if Eckert would rehire Buck, to which Eckert answered, "No."

Hall urges the evidence is legally and factually insufficient to prove the statements were made and published, that the statements were invited as a matter of law, and that there is no evidence to support the jury's finding that the statement was calculated to convey that Buck was terminated for serious misconduct. The record before us belies these contentions.

Burton testified that Eckert made the statements and that *because of* Eckert's comments, he was not willing to extend an offer of employment to Buck. He stated, "When I talked to Mr. Eckert at Frank B. Hall agency, he led me to believe that there was something that he was unable to discuss with me" and "[t]here was something that he was unwilling to tell me about that I had to know."

Hall argues that Eckert did not remember ever talking to Burton; the words are

susceptible to a non-defamatory interpretation; and Burton later testified he inferred nothing negative about Buck from Eckert's statements. Thus, Hall contends, there is no evidence or insufficient evidence that Burton attached any defamatory significance to Eckert's statements. We find the evidence sufficient to show that Burton reasonably understood them in a defamatory sense.

■■■ When an ambiguity exists, a fact issue is presented. The court, by submission of proper fact issues, should let the jury render its verdict on whether the statements were fairly susceptible to the construction placed thereon by the plaintiff. *Easley v. Express Publishing Co.,* 299 S.W.2d 782, 784 (Tex.Civ.App.—San Antonio 1957, writ ref'd n.r.e.). Here, the jury found (1) Eckert made a statement calculated to convey that Buck had been terminated because of serious misconduct; (2) the statement was slanderous or libelous; (3) the statement was made with malice; (4) the statement was published; and (5) damage directly resulted from the statement. The jury also found the statements were not substantially true. The jury thus determined that these statements, which were capable of a defamatory meaning, were understood as such by Burton. The jury is the exclusive judge of the credibility of witnesses and the weight to be given their testimony. In resolving contradictions and conflicts, they may choose to believe all or part or none of the testimony of any one witness in arriving at the finding it concluded was the most reasonable under the evidence. *United States Fire Insurance Co. v. Biggs,* 614 S.W.2d 496 (Tex.Civ.App.—Amarillo 1981, no writ). The jury was instructed that statements were not published if Buck authorized, invited or procured them and if he knew in advance the contents of the invited communications. Therefore, in responding affirmatively to the special issues on publication, the jury necessarily found that Eckert's statements were calculated to imply and did in fact imply that Buck had been terminated because of serious misconduct and that these statements were not invited.

The jury could reasonably have believed that Buck did not know why he was fired and did not know in advance that Eckert would make defamatory remarks to Burton. The findings are supported by the evidence and are not against the great weight and preponderance of the evidence. Points of error fourteen through twenty-five are overruled.

Points of error twenty-six through twenty-nine concern the legal and factual sufficiency of the evidence to support the jury's findings in answer to Special Issue No. 7 that the defamatory statements were made with malice. The communications in question were (1) statements made by Eckert to Lloyd Barber, Charles Burton and two Hall employees, Peter Barbara and Warren Johnson; (2) Kaliff's remarks to Lloyd Barber; (3) Hilley's comments to Lloyd Barber; and (4) a note written by Hilley and attached to a box of files in Hall's offices.

Warren Johnson, who was then employed by another firm, testified that Eckert contacted him in the fall of 1977. Eckert said he had terminated an employee named Larry Buck, whom Eckert referred to as a "crook." Eckert *then* asked Johnson to ascertain whether Buck in fact had a criminal record.

Peter Barbara, a former vice-president at Hall, testified that Eckert had called Buck a "crook." Barbara said that while they were on a business trip, Eckert made the derogatory comments to him, referring to Buck as dishonest.

In August, 1980, Leone Talbot, administrative manager at Frank B. Hall & Co., found a box of files lying in a corner at Hall's Houston office. Attached was a note reading: "Files brought by Larry Buck to Frank B. Hall & Co. when he joined the firm 6/76—They have been retained in case there is a need for them as evidence in a lawsuit pending. V. Hilley." The box contained information from Alexander & Alexander; the insinuation was that Buck had "stolen" this property from his previous employer. The other statements in question were those by Kaliff,

Eckert and Hilley to Lloyd Barber; they have been outlined above.

The jury was instructed that a statement is made with malice if it was made with knowledge that it was false, or with reckless disregard of whether it was false or not. This was the definition of malice required by the United States Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The jury found that all of the above statements were published, were defamatory and were made with malice.

Although there may be question as to whether the submission of the *New York Times* definition of malice is proper in a case involving a private plaintiff and a non-media defendant, neither party has complained that a different standard should have applied. We therefore confine our examination to whether the record supports the jury's findings that the statements were made with knowledge of their falsity or with reckless regard of the truth of the statements.

In *El Paso Times, Inc. v. Trexler*, 447 S.W.2d 403 (Tex.1969), the Texas Supreme Court addressed the issue of malice.[1] There, the court declared the following definition of malice incorrect: "done with a desire or intent to injure a person through a deliberate falsehood or with actual knowledge of its probable falsity." In reversing the court of civil appeals, the supreme court found no evidence that would have supported a finding of malice under the *correct* (*New York Times*) standard. The only evidence relied upon in *Trexler* to show actual malice was the failure of a newspaper employee to make an investigation about the truth or falsity of a "letter to the editor." *Id.* at 406. There was no evidence of ill will or animosity. Citing the First Amendment, the court held that failure to investigate or negligence in failing to act as a reasonably prudent person is insufficient to uphold a finding of malice under the *New York Times* standard. *Id.*

at 406. However, we find that in the case before us, there is evidence which supports the jury's findings of malice.

■ Malice has been equated with "a want of good faith." *British Overseas Airways Corp. v. Tours and Travel of Houston, Inc.*, 568 S.W.2d 888 (Tex.Civ. App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.). While evidence of ill will alone is not enough to establish malice, proof that the defendant entertained ill will toward the plaintiff is probative evidence that the defendant published the information either knowing of its falsity or with reckless disregard for its truth or falsity. *See Stearns v. McManis*, 543 S.W.2d 659 (Tex.Civ.App. —Houston [1st Dist.] 1976, writ dism'd). Thus, when coupled with other evidence, proof of ill will may furnish a sufficient basis for a jury's finding of malice.

Here there was evidence that the relationship between Eckert and Buck was strained at best. Buck testified that Eckert was angered when Buck would not testify as Eckert wished in Alexander & Alexander's lawsuit against Eckert for breach of the non-competition agreement Eckert had signed while employed by Alexander & Alexander. The men had disagreements over the management of Hall's Houston office. Eckert testified that his relationship with Buck deteriorated instantly when Eckert became officer manager at Hall. Eckert said he was constantly irritated by Buck's expense account reports; he was critical of Buck for berating members of Hall's office staff. Eckert expressed disapproval of Buck's "office politicking" and described the office relationship as a "constant hassle" and a "day-in-and-day-out battle." Eckert complained of having to "meet all of [Buck's] little whims." There was evidence that Eckert drew an annual salary of $39,000.00, with no profit sharing or commission benefits, while Buck, Eckert's subordinate, had a salary of $80,000.00 plus a sizeable commission in-

---

**1.** Although *Trexler* involved a public figure versus a media defendant, the case is instructive because the court applied the *New York Times* standard and examined the evidence to support a finding of malice under that definition.

centive, profit sharing and expense benefits.

Kaliff testified he ran a character reference check on Buck prior to offering him a job at Hall, and it revealed nothing derogatory about Buck's character or reputation. Kaliff also admitted that Buck's reputation and character were good at the time of trial. When asked at trial about the accusations of "office politicking," Kaliff admitted that the information he had received ° about Buck was secondhand, from Eckert. Kaliff told Lloyd Barber, "all my information (concerning Buck) is secondhand...."

Hilley admitted that she did not in fact know who brought the box of files to Frank B. Hall & Co., or when they arrived. She said that she merely found the box in Buck's office after his termination and wrote the note hereinabove attributed to her and attached it to the box of files.

Buck had brought several major accounts to Frank B. Hall & Co., and had generated about $308,000.00 in commission income to Hall. After Buck was fired, Buck's accounts were assigned "almost immediately" to other Hall agents. All of Buck's clients were contacted at once in an effort to retain Buck's accounts. There is evidence that Hall saved approximately $75,000.00 in commission and salary to Buck by firing him early.

Hall argues there is no evidence that Kaliff, Eckert or Hilley knew any of their statements were false or that they doubted the truth of their statements; additionally, Hall urges Eckert testified he never said anything about Buck that he believed to be untrue.

■ We recognize that *New York Times* may require proof of the subjective state of mind of the publisher. *See St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968). However, this does not mean that a plaintiff must secure an admission from the defendant that he published the statement knowing of its falsity or with serious doubt as to its truth. The issue is most easily proved by circumstantial evidence. *Gulf*

*Construction Co. v. Mott*, 442 S.W.2d 778 (Tex.Civ.App.—Houston [14th Dist.] 1969, no writ). There must be sufficient evidence *to permit the conclusion* that the defendant in fact entertained serious doubts as to the truth of his publication. *St. Amant*, 390 U.S. at 731, 88 S.Ct. at 1325. (emphasis added).

■ Here the jury was warranted in finding that all of the statements except the note written by Hilley and attached to the box of files were made with malice. Buck impeached the testimony of Kaliff and Eckert several times before the jury; Eckert's reputation for truth and veracity was in question. Thus, the jury was entitled to disbelieve the profession of good faith. The jury was entitled to believe that Eckert harbored animosity toward Buck, that Kaliff attacked Buck's character with serious doubts as to the truth of his accusations, that Hilley entertained serious doubts as to the truth of her assertions and that Hall had self-serving motives for Buck's early termination.

■ We hold that there is no evidence to support the jury finding in answer to Special Issue No. 7(7)(d) to the effect Virginia Hilley acted with malice in writing the note she attached to the box of files she found in Buck's office after his termination. However, we have held the evidence sufficient to support all of the other findings of malice, and the absence of any evidence to support the answer to Special Issue No. 7(7)(d) does not require a reversal of the judgment. Points of error twenty-six through twenty-nine are overruled.

■ In points of error thirty through thirty-two appellant contends the evidence is legally and factually insufficient to support the award of exemplary damages. It is well-settled that exemplary damages may be allowed in a defamation case where the defamed party establishes the existence of a wilful or wanton act sufficient to support a finding of malice. *British Overseas Airways Corp.*, 568 S.W.2d at 894. The evidence was sufficient to support a finding of actual malice; and

in response to the exemplary damage issue, the jury found that Hall had acted with "ill will, bad intent, malice or gross disregard to the rights of Buck." Points of error thirty through thirty-two are overruled.

■ Under points of error thirty-three through thirty-six Hall argues that the statements to Barber and Burton were qualifiedly privileged as a matter of law and that the trial court erred in refusing to submit a special issue asking whether the statements to Barber and Burton were qualifiedly privileged.

Even if the statements in question were indeed qualifiedly privileged, the jury's findings of malice abrogated any such privilege. *Houston v. Grocers Supply Co.*, 625 S.W.2d 798 (Tex.App.—Houston [14th Dist.] 1981, no writ). Those findings are supported by the evidence; thus, the issue of qualified privilege is irrelevant. Points of error thirty-three through thirty-six are overruled.

■ In points of error thirty-seven through forty Hall urges that Hilley's note was absolutely or conditionally privileged and thus cannot serve as a basis for liability.

Communications made in the course of a judicial proceeding will not serve as the basis of a civil action for libel or slander, regardless of the negligence or malice with which they are made. *James v. Brown*, 637 S.W.2d 914 (Tex.1982). This privilege has traditionally applied only to in-court proceedings: statements made by the judge, jurors, counsel, parties or witnesses in open court, or in pre-trial hearings, depositions, affidavits, pleadings or other papers in the case. *Id.* at 916–917. The supreme court in *James* expanded this privilege and applied the protection of absolute privilege to out-of-court statements. In connection with ongoing guardianship proceedings, the court found the reports of two doctors, addressed to the judge and to a party's attorney, to be absolutely privileged. The supreme court's opinion is based upon RESTATEMENT (SECOND) OF TORTS § 558, which provides an abso-

lute privilege to a witness who publishes defamatory statements in communications preliminary to a proposed judicial proceeding or as a part of a judicial proceeding in which he is testifying, if it has some relation to the proceeding. The privilege is meant *to protect the witness while testifying* or *while in private with an attorney* about matters involved in *litigation.*

Appellant cites *James* as authority for its position that Hilley's note, as a communication made by a witness during a judicial proceeding, is absolutely privileged. We cannot agree that the note in the instant case is on equal footing with the communications involved in *James.* Hilley's note was not addressed or directed to the attention of any particular person involved in the litigation. It was not made as a basis for statements to be used in court, or in contemplation of her testimony in court or an assertion in an affidavit, deposition, pleading or other matter before the court. It was not intended as a confidential communication to an attorney. To adopt Hall's position would be to hold that once a judicial proceeding is initiated, any person who may be called as a witness may make gratuitous defamatory statements to any person about the plaintiff and be shielded by the defense of absolute privilege. Since absolute privilege completely forecloses a remedy in a civil action, the defense of absolute privilege has traditionally been very limited. *Parker v. Holbrook*, 647 S.W.2d 692 (Tex.App.—Houston [1st Dist.] 1982, writ ref'd n.r.e.). The absolute privilege of *James* does not apply to the facts at hand.

Hall's alternative argument is that the note carried a qualified privilege. We do not agree. A qualified privilege comprehends communications made in good faith on subject matter in which the author has an interest or with reference to which he has a duty to perform to another person having a corresponding interest or duty. *Houston v. Grocers Supply Co.*, 625 S.W.2d at 800. Here the note was not directed to the attention of anyone; the privilege does not apply. Moreover, the jury's finding that the statement was made with

malice destroyed any qualified privilege which may have existed. Points of error thirty-seven through forty are overruled.

In points of error forty-one and forty-two Hall contends the trial court erred in refusing to submit special issues placing the burden of proof on Buck that each of the allegedly libelous or slanderous statements was false. The trial court had placed the burden of proof on Hall under Special Issue 7(c). For reasons set forth below we hold the trial court did not err in refusing Hall's requested special issues.

 For many years the courts of Texas have held in libel and slander actions that truth of the defamatory statements is an affirmative defense, and the burden of proving truth by a preponderance of the evidence is on the defendant. *Norris v. White,* 154 S.W.2d 319 (Tex.Civ.App.—San Antonio 1941, writ ref'd w.o.m.); *Ledgerwood v. Elliott,* 51 S.W. 872 (Tex.Civ.App. 1899, no writ); *Clark v. Bohms,* 37 S.W. 347 (Tex.Civ.App.1896, no writ); *Coles v. Thompson,* 27 S.W. 46 (Tex.Civ.App.1894, no writ). This rule is in accord not only with the common law but also with the express enactment of the Texas legislature. TEX.REV.CIV.STAT.ANN. art. 5431 (Vernon 1958).

Both expressly and implicitly Texas courts have consistently recognized that truth is a defensive matter. *Cranfill v. Hayden,* 97 Tex. 544, 80 S.W. 609, 614–16 (1904); *Parker v. Holbrook,* 647 S.W.2d 692 (Tex.App.—Houston [1st Dist.] 1982, writ ref'd n.r.e.); *Shihab v. Express-News Corp.,* 604 S.W.2d 204 (Tex.Civ.App.—San Antonio 1980, writ ref'd n.r.e.); *Downer v. Amalgamated Meatcutters and Butcher Workmen of North America,* 550 S.W.2d 744, 747 (Tex.Civ.App.—Dallas 1977, writ ref'd n.r.e.); *Rehkopf v. Texarkana Newspapers, Inc.,* 460 S.W.2d 939, 942 (Tex.Civ.App.—Texarkana 1970, writ ref'd n.r.e.); *Templeton v. Rogers,* 450 S.W.2d 900, 902 (Tex.Civ.App.—Beaumont 1970, writ dism'd); *Gulf Construction Company v. Mott,* 442 S.W.2d 778, 784 (Tex.Civ.App.—Houston [14th Dist.] 1969, no writ); *Express Publishing Co. v. Gonzalez,* 350 S.W.2d 589, 592 (Tex.Civ.App.—Eastland 1961, writ ref'd n.r.e.); *Lovejoy v. Mutual Broadcasting System,* 220 S.W.2d 308, 312 (Tex.Civ.App.—El Paso 1948, no writ); *Caller Times Pub. Co. v. Chandler,* 122 S.W.2d 249, 252 (Tex.Civ.App.—San Antonio 1938), *aff'd,* 130 S.W.2d 853 (Tex.1939); *General Motors Acceptance Corporation v. Howard,* 474 S.W.2d 929 (Tex.Civ.App.—Beaumont 1971), *aff'd,* 487 S.W.2d 708 (Tex.1972)..

Apparently not denying that Texas law had been settled for many years to the effect stated above, appellant argues that because of recent United States Supreme Court decisions the burden is now on the plaintiff to prove falsity of defamatory statements. In support of its argument appellant relies on three recent cases: *Borden, Inc. v. Wallace,* 570 S.W.2d 445 (Tex. Civ.App.—El Paso 1978, writ dism'd); *Roegelein Provision Co. v. Mayen,* 566 S.W.2d 1 (Tex.Civ.App.—San Antonio 1978, writ ref'd n.r.e.); and *A.H. Belo Corp. v. Rayzor,* 644 S.W.2d 71 (Tex.Civ.App.—Fort Worth 1982, writ ref'd n.r.e.).

In *Borden v. Wallace* the trial court, apparently without objection, submitted a special issue inquiring whether the alleged defamatory statements were true, thus placing the burden of proof on the defendant. The jury answered "No," and thereby failed to find from a preponderance of the evidence that the statements were true. On appeal the El Paso Court of Civil Appeals stated that the issue should have placed the burden on the plaintiff to prove that the statement was false. However, immediately after making that statement, the court further stated: "But the semantics of the issue become unimportant, for we conclude that as a matter of law the facts inquired about in Special Issue No. 6 were true." Contrary to appellant's contention, the court did not cite any authority for its statement that the issue should have placed the burden of proof on the plaintiff, and the court's opinion contains no analysis or statement of the reasons why the plaintiff should have the burden of proving falsity.

In *Roegelein Provision Company v. Mayen,* an appeal from a judgment awarding damages for libel, Roegelein contended there was no finding that the defamatory statements were false and, therefore, the judgment should be reversed. The San Antonio Court of Civil Appeals did not decide the question as to where the burden of proof should be placed on the issue of the truth or falsity of the defamatory statements. That court stated clearly the following:

> For the purpose of this discussion we assume that, as the result of a series of decisions by the Supreme Court of the United States, beginning with *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), a person who seeks recovery for defamation has the burden of proving that the defamatory statement is false. The Mayens do not contend otherwise.

The court then pointed out that the jury had found malice on the part of Roegelein and that malice was one finding necessary to the recovery for libel. The court held that because Roegelein had neither requested submission of, nor objected to the court's failure to submit the omitted issue concerning falsity, the court would presume that the omitted issues were found in such manner as would support the judgment in favor of Mayens if the evidence supported such finding. This is definitely not a holding by the San Antonio Court of Civil Appeals that the plaintiff in a libel or slander case has the burden of proving that the defamatory statements are false. In *A.H. Belo Corp. v. Rayzor* the *Dallas Morning News* wrote several articles about a scandal involving officials at North Texas State University. The paper quoted Rayzor as having called the vice-president of North Texas State and saying "I'm going to get your ass. The worm has turned and I'm going to hire somebody to get you." The article in the paper referred to Rayzor's statements as "an alleged threat." Rayzor sued claiming the newspaper libeled him by reporting that he had "threatened" the vice-president of the University.

The Fort Worth Court of Appeals reversed the judgment in favor of Rayzor, holding that he failed to prove that the newspaper article contained any "false, defamatory fact about Rayzor," and that the use of the term "alleged threat" was at most an opinion about the statement Rayzor made and could not support the jury's findings that the newspaper article made false and libelous implications about Rayzor.

It is true that in *Rayzor,* the court of appeals stated that the burden of proving falsity was on Rayzor, but such statement was not necessary to the court's decision. There the trial court did in fact submit the issue with the burden of proof on Rayzor and the jury answered "We do not." The effect of the answer is that Rayzor failed to carry his burden of proving that the defamatory statement was false. It does not constitute a jury finding that the statement was true. There is no indication in the opinion of the court of appeals that Rayzor complained of having to carry the burden of proving falsity. Furthermore, the court of appeals held as a matter of law that all of the statements in the articles were either factually true or constituted fair and privileged comment on the general situation existing at North Texas State University and the phone calls from Rayzor to Carter and Miller.

In our opinion the cases relied on by appellant do not support appellant's contention that Texas law has changed so as to now place on a private defamation plaintiff the burden of proving falsity of the defamatory statements in order to recover damages for libel and slander.

Furthermore, the decisions of the United States Supreme Court in the mid 1970's do not compel the change in Texas law argued by appellant Hall. In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) the Supreme Court specifically held that the First Amendment to the Constitution does not permit the imposition of liability without fault on a publisher or broadcaster of defamatory falsehoods injurious to a private individual. Aside

from this restriction, the court said the states may define for themselves the appropriate standard of liability. 418 U.S. at 346–47, 94 S.Ct. at 3010. The *Gertz* court had refused to apply to a private defamation plaintiff the strict standard of *New York Times Co. v. Sullivan, supra,* which had held that a media defendant could not be held liable to a public figure for defamation damages unless the plaintiff proved actual malice. There has been no decision by the United States Supreme Court holding that in order to prove "fault" of the defendant, the plaintiff must prove falsity of the defamatory statement. In fact the year after *Gertz* was decided the United States Supreme Court in *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) declined even to state whether the Constitution required that truth be recognized as a defense in a defamation action brought by a private person. The court stated:

It is true that in defamation actions, where the protected interest is personal reputation, the prevailing view is that truth is a defense; . . . .

The Court has nevertheless carefully left open the question whether the First and Fourteenth Amendments require that truth be recognized as a defense in a defamation action brought by a private person as distinguished from a public official or public figure.

420 U.S. at 489–90, 95 S.Ct. at 1043–44. In our opinion *Gertz* does not imply that the Constitution places on private defamation plaintiffs the burden of proving falsity. We believe that another decision by the United States Supreme Court in *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976) supports our conclusion in this regard. In *Firestone,* a Florida state trial court had placed the burden on the defendant to prove that a newspaper report about a non-public plaintiff was true. Under Florida law the only findings required for determination of liability for defamation were (1) whether the article was defamatory, (2) whether it was true, and (3) whether the defamation caused the plaintiff harm. The Supreme Court held

that with respect to liability for defamation of a private individual, these three findings would have been sufficient to impose liability if there had been some finding of fault on the part of the defendant. The Supreme Court vacated and remanded the case, not because the burden of proving truth had been placed on the defendant, but because there had been no finding of fault on the part of the defendant within the meaning of *Gertz.*

 Under the decisions of the Supreme Court in *Gertz, Cox Broadcasting* and *Firestone* a private defamation plaintiff satisfies the Constitution by proving fault. In this case Buck, the appellee, has satisfied the Constitution's requirements by proving malice as defined in *New York Times v. Sullivan.* Malice under this *New York Times* test and as defined in the court's charge to the jury in the instant case is proved if the defamatory statement is made with knowledge that it is false or reckless disregard of whether it was false or not. In the instant case the jury findings that the statements were made with reckless disregard of whether or not they were false is sufficient proof of fault as required under *Gertz.*

Points of error forty-one and forty-two are overruled.

 By points of error forty-three and forty-four Hall maintains Hilley's written note stating that a box full of files to which the note was attached were files Buck had taken with him to Hall was substantially true as a matter of law and the jury's finding to the contrary is against the great weight and preponderance of the evidence. The jury answered "No" to Special Issue No. 7(7)(C) inquiring whether it found from a preponderance of the evidence that the written note was substantially true. This answer was a failure to find the note true, not a finding that it was not true.

 Hilley admitted that she did not know who had brought the box of files to Hall or when it had arrived. Another Hall employee testified she saw Hilley's note and understood it to be uncomplimentary to

Buck. The evidence is clear that many files in the box were Hill files. Although the box contained some Alexander & Alexander materials, there was no direct proof that Buck brought to Hall any of the materials contained in the box. A number of other Hall employees had come from Alexander & Alexander and could have brought such material. The jury's failure to find that the note was substantially true is not against the great weight and preponderance of the evidence. Points forty-three and forty-four are overruled.

Hall next complains in points forty-five through fifty-one there is no evidence to support the jury's finding that damage directly resulted from the statements in question and no evidence to support the jury's findings as to the amount of damage suffered by appellee as a result of the defamatory statements.

The jury responded affirmatively to a list-type issue inquiring whether damage directly resulted from each of the statements. The following damage issues were submitted:

### SPECIAL ISSUE NO. 12

What sum of money, if paid now in cash, do you find would fairly and reasonably compensate Buck for his damages, if any, that you find directly resulted from slanderous or libelous statements, if any, made by Hall? Consider the following elements of damages, if any, and none other:

A. Lost earnings caused by his inability to obtain employment similar to that at Alexander & Alexander following termination from Hall on March 31, 1977;

B. Mental anguish, humiliation and embarrassment; and

C. Damage to reputation and character.

Answer in dollars and cents.

Answer: 605,000.00

At the point the jury finds Buck's earnings in his consulting work would have first equaled or exceeded the sum he

would have earned by employment similar to that at Alexander & Alexander, no further offsets should be made.

Damages need not be absolute and certain, but may not be purely speculative.

### SPECIAL ISSUE NO. 13

What portion of Buck's lost earnings caused by slanderous or libelous statements, if any, made by Hall do you find occurred during the time period March 31, 1977, through May 31, 1979?

Answer in dollars and cents.

Answer: 414,000.00

█ Hall urges that the so-called "constitutional privilege" delineated in *Gertz* should apply in this case. The *Gertz* privilege provides that between a private plaintiff and a publisher or broadcaster of defamatory statements, the defamer, in the absence of actual malice, is liable only for "actual injury." Hall contends that the *Gertz* privilege precludes the application of presumed damages, and it was thus incumbent upon plaintiff to show "actual injury" more than mere worry, anxiety, vexation or anger. Hall urges that Buck's testimony of depression, loss of weight, difficulty in sleeping, and problems with his wife and family were insufficient. He argues that Buck needed to prove "intense pain of body or mind, or a high degree of suffering." *Ryder Truck Rentals, Inc. v. Latham*, 593 S.W.2d 334, 339 (Tex.Civ.App.—El Paso 1979, writ ref'd n.r.e.). Buck counters that the *Gertz* privilege should not apply to Hall and that the damage award should not hinge upon proof of actual injury.

We need not address the issue, however, because here the jury found the statements were made with actual malice, and those findings are supported by the evidence; the *Gertz* privilege applies only in the absence of actual malice. Thus, it was not necessary for Buck to prove "actual injury." *See Gertz*, 418 U.S. at 349, 94 S.Ct. at 3011.

█ Furthermore, Buck testified that he suffered depression, self-doubt, and weight loss as a result of the episode in question. He also had difficulty sleeping

and suffered distress in his marital and family relationships because of the attacks on his integrity. Burton's testimony clearly shows that Eckert's statements had the direct effect of deterring Burton from dealing with Buck. As a result, Burton did not extend Buck an offer of employment. Joseph Chernow, a certified public accountant, made a projection of Buck's potential earnings had he secured a job comparable to his position at Alexander & Alexander. Basing his calculations upon what Buck would have earned if he had not left Alexander & Alexander, or, if after his termination he was able to get a job similar to the one at Alexander & Alexander, Chernow testified that Buck suffered a pecuniary loss of over $686,000.00. The jury's finding of $605,000.00 in damages was in line with the evidence. Points forty-five through fifty-one are overruled.

By points fifty-two and fifty-three, Hall urges the court erred in refusing to submit special issues inquiring whether Eckert's statements were referable to his employment duties.

An action is sustainable against a corporation for defamation by its agent, if such defamation is referable to the duty owing by the agent to the corporation and was made while in the discharge of that duty. Neither express authorization nor subsequent ratification is necessary to establish liability. *Texam Oil Corp. v. Poynor*, 436 S.W.2d 129 (Tex.1968).

Lester Eckert was executive vice president and head of Hall's Houston office. There is no dispute that Eckert was in fact the manager in charge of Hall's Houston office. Eckert took an active role in contract negotiations between Hall and Buck and served as a go-between for Hall's corporate attorneys with respect to Buck's employment contract. He took responsibility for working out some details of Buck's employment, including Buck's pension and life insurance benefits. He was familiar with the producers' salaries and commissions and was responsible for reviewing employees' production statistics and expense account reports. There was evidence that Eckert played an active role in making employment decisions and he was a member of Hall's executive committee.

There is no evidence in the record which suggests that Eckert's statements were made outside the scope of his employment. Hall points to the testimony of Thomas O'Brien, vice-president and general counsel of Hall, wherein O'Brien admitted on cross-examination that Hall did not have a general practice of calling former employees "crooks." We are not persuaded. The record contains no evidence which shows any limitation on Eckert's broad duties as vice-president and office manager.

Peter Barbara testified that Eckert made the defamatory statements on a business trip during a conversation about Barbara's employment contract. Eckert made the remarks in response to Barbara's request for a contract similar to Buck's. Although Eckert did not recall making the remarks under these circumstances, Eckert admitted having conversations with Barbara and calling Buck a "crook." When asked about the circumstances of the conversations Eckert answered, "Peter Barbara was part of our Executive Committee and he knew very well what was going on, and he knew about files that were stolen that we discovered in the office."

Eckert denied making any statements to Warren Johnson. However, Johnson testified that Eckert contacted him in the fall of 1977, while Eckert was Hall's executive vice-president. Eckert related that Larry Buck had been a Hall employee whom Eckert had terminated. After making the defamatory remarks, Eckert requested Johnson to determine whether in fact Buck had a criminal record.

The statements to Barber were made in response to Barber's inquiries concerning Buck's employment with Hall.

Hall points to no evidence which shows that Eckert made the statements while he was not acting on Hall's behalf, or in his capacity as Hall's representative. There is no evidence which indicates that Eckert was not authorized to furnish information

pertaining to a former employee, or that Eckert's authority as manager was limited with respect to personnel decisions and activities. The evidence is uncontradicted that Eckert was furthering Hall's business when he uttered the slanderous words. There being no evidence to raise a fact issue as to Eckert's course and scope of employment, the court did not err in refusing to submit the tendered issue. *See Wagner v. Caprock Beef Packers Co.,* 540 S.W.2d 303 (Tex.1976). Points of error fifty-two and fifty-three are overruled.

Hall's points of error fifty-four through sixty-six concern the impeachment of its principal witness, Mendel Kaliff.

Kaliff owned and operated his own insurance business until 1975 when Kaliff sold out to Hall and joined Hall's organization. During trial, appellant impeached Kaliff with evidence that (1) prior to the Hall buy-out, Kaliff had engaged in improper billing practices; (2) Kaliff had been involved in "insider trading" as prohibited by the Securities and Exchange Act of 1934; (3) Kaliff had resigned as an officer and director in October 1978, but had been retained by Hall as a "senior consultant;" (4) Kaliff had surrendered all of his insurance licenses to the Texas State Board of Insurance; (5) Hall and Kaliff had paid about $3,000,000.00 restitution; (Kaliff himself had paid slightly more than half of this amount, and Hall had paid the remainder; Kaliff then indemnified Hall); and (6) Hall had loaned Kaliff $151,000.00, interest-free.

Hall first argues that the doctrine of *res inter alios acta* precluded the admission of this evidence. We disagree. The rule provides that prior acts or transactions by one of the parties are not admissible *to prove that similar acts have reoccurred;* the prior acts are thus incompetent evidence when offered for this purpose. *See Texas Farm Bureau Mutual Insurance Co. v. Baker,* 596 S.W.2d 639 (Tex.Civ.App.—Tyler 1980, writ ref'd n.r. e.). Here, unlike the cases cited by Hall, the evidence was not offered as evidence that the party had engaged in the same pattern of conduct, e.g., that Kaliff again

had engaged in questionable insurance practices, but rather that Kaliff was beholden to Hall.

Hall also argues that the evidence amounted to an improper attack on Kaliff's character with evidence of specific acts of misconduct. This position is likewise inapposite, because the evidence was admissible to impeach Kaliff's *credibility* rather than his *character.* A party has a right to show interest, bias, or prejudice which may affect a witness' credibility. *City of Longview v. Boucher,* 523 S.W.2d 274 (Tex.Civ.App.—Tyler 1975, writ ref'd n.r.e.). In this respect, the jury is entitled to know any fact which would tend to influence the testimony given by a witness. The jury should be given the opportunity to judge for themselves the witness's credibility in light of the relationship between the parties, the witness's motive for testifying, or any matter which would tend to influence the testimony given by a witness. *Steve v. State,* 614 S.W.2d 137 (Tex.Crim. App.1981); *City of Longview,* 523 S.W.2d at 279.

Here the testimony showed Kaliff's relationship with Hall; it was proper to allow the jury to make its own determination of whether Kaliff was grateful to Hall in light of factors which may have tended to color his testimony: (1) Hall's retaining Kaliff with substantial compensation despite Kaliff's questionable conduct; (2) Hall's payment of over a million dollars in restitution on Kaliff's behalf; and (3) Hall's $151,000.00 no-interest loan to Kaliff.

The trial court has considerable discretion in permitting cross-examination of a witness to show bias or prejudice; the motives which operate on the mind of a witness are not immaterial or irrelevant. *Steve,* 614 S.W.2d at 140. Facts which tended to show Kaliff's relationship with Hall and his motive for testifying were proper impeachment evidence; the court did not abuse its discretion in admitting it before the jury. Moreover, we remain unconvinced that the admission of the impeachment evidence probably caused the

rendition of an improper verdict. The error, if any, is harmless. TEX.R.CIV.P. 434. Points of error fifty-four through sixty-six are overruled.

We next consider Hall's points of error sixty-seven through seventy-five. All of these points deal with Hall's contention that the letter agreement of April 30, 1976 was not a contract. Following some preliminary negotiations, Mendel Kaliff on April 30, 1976, wrote appellee the following letter, which reads in pertinent part:

This letter will serve as an informal memorandum concerning our present agreement with regard to your compensation should you become associated with Frank B. Hall & Co.

We would reimburse you for all usual and necessary travel and entertainment expenses. You would have an annual salary of $80,000 plus an additional compensation amounting to 7½% of net retained commission income for each employment year, up to a maximum of $600,000 of commissions in any year. Also, we will have a division of "profits" that we would enjoy on your production according to the following formula.

Frank B. Hall would deduct the first 50% of net retained commissions, also deduct your salary and supplemental commission (the 7½%), also deduct your actual travel and entertainment as well as your actual fringe benefit cost, and any balance would be shared equally between you and Frank B. Hall. The attachment is designed to illustrate this formula.

We would execute a three-year employment agreement which would also contain a three-year covenant not to compete, and these agreements, of course, would need to be acceptable to you and to Frank B. Hall & Co.

This letter is intended to be a summary of the agreement that we have at this time.

Hall's position is that the letter expressly provided for a later agreement and does not contain many essential terms of the agreement; thus, the letter is not an enforceable contract. Specifically, Hall points to the fact that Buck refused to sign three drafts of the parties' formal agreement and that there was an ongoing debate about Buck's compensation formula and the terms of a covenant not to compete.

■ Two persons may fully agree upon the terms of a contract, knowing that there are other matters on which they have not agreed and on which they expect further negotiation. Such an expectation does not prevent the agreement already made from being an enforceable contract. This may be true even though they expressly provide in their agreement that the new matters, when agreed upon, shall be incorporated along with the contract already made. *Scott v. Ingle Bros. Pacific, Inc.*, 489 S.W.2d 554 (Tex.1972) citing 1 CORBIN ON CONTRACTS (1963).

■ Here, the fact that Kaliff and Buck may have contemplated a more formal contract which was never executed may be *evidence* that the letter was not meant to embody their agreement; likewise, the unsettled negotiations on the covenant not to compete may be indicative that the letter was only a tentative draft or proposal of an agreement. However, we view neither of these factors as conclusive; the jury was entitled to resolve the question of the intention of the parties. The letter was not unenforceable as a matter of law.

■ At trial, Kaliff admitted several times that the letter contained the essential terms of the agreement that he and Buck had reached. When asked why he wrote the letter Kaliff responded, "[B]ecause Larry Buck wanted the compensation formula spelled out in detail, and I did, also, because it was important to both of us to make sure that we had a clear understanding of what that was going to be ... and I didn't want any misunderstanding to come up in the future, and also ... I wanted it clearly understood as did Larry that the no-compete [sic] would be part of the contract. These were the items—the essential items that the lawyer would have to prepare in the contract." Kaliff testified that he intended for the letter to be an

"informal memo ... setting forth what [they had] agreed to." Buck testified that the letter contained the essential terms of the agreement reached with Kaliff. The jury found that the parties intended the letter to be an agreement; that finding is supported by the evidence. Points sixty-seven through seventy-five are overruled.

Lastly, in points of error seventy-six through eighty Hall complains of the jury's findings on the damage issues. Considering the elements of lost earnings, mental anguish, humiliation, embarrassment and damage to reputation and character, the jury found actual damages resulting from the defamation to be $605,000.00; $414,000.00 of that amount was attributed to lost wages. The jury found exemplary damages of $1,300,000.00.

The damages resulting from libel or slander are purely personal and cannot be measured by any fixed standard or rule. The amount to be awarded rests largely in the discretion of the jury, and the appellate court will not disturb the verdict unless it appears from the record to be excessive or the result of passion, prejudice, or other improper influence. *Winkel v. Hankins*, 585 S.W.2d 889 (Tex.Civ.App.—Eastland 1979, writ dism'd).

The record reflects that Buck had been in the insurance business since 1957. He was an established producer who, shortly before his departure from Alexander & Alexander, had an annual salary of $80,000.00 plus lucrative benefits; he was Alexander & Alexander's top producer in Houston. After his termination from Hall in March, 1977, he unsuccessfully sought employment with numerous insurance firms until the time of trial. He discovered that Hall's employees were making derogatory statements about him, reflecting on his integrity and his ability to produce business. Buck related the devastating effect the episode had on his emotional well-being and his personal relationships. There was evidence that at least one employment opportunity did not materialize because of the defamatory statements. There is ample evidence of Buck's pecuniary loss as well as evidence that an insurance producer's reputation is a most valued asset. The jury found the statements were made with actual malice, and those findings are supported by the evidence.

We hold that the evidence supports the award of actual damages and the amount awarded is not manifestly unjust. Furthermore, in responding to the issue on exemplary damages, the jury was instructed that exemplary damages must be based on a finding that Hall "acted with ill will, bad intent, malice or gross disregard to the rights of Buck." Although there is no fixed ratio between exemplary and actual damages, exemplary damages must be reasonably apportioned to the actual damages sustained. *Alamo National Bank v. Kraus*, 616 S.W.2d 908 (Tex.1981). Because of the actual damages and the abundant evidence of malice, we hold that the award of punitive damages was not unreasonable. Points seventy-six through eighty are overruled.

The judgment of the trial court is affirmed.